*718
 
 OPINION OF THE COURT
 

 Simons, J.
 

 Jean Harris is the author of a book entitled "Stranger in Two Worlds”. She has assigned the royalties due from her publisher, petitioner MacMillan, Inc., to petitioner Children of Bedford, Inc., a not-for-profit corporation organized under New York law. Respondents are the chair and members of the Crime Victims Board of the State of New York. On October 26, 1987 respondents issued an order declaring that royalties for Harris’s book must be deposited in escrow because the book contains her version of the killing of Dr. Herman Tarnower, a crime which resulted in her conviction of second degree murder
 
 (see, People v Harris,
 
 57 NY2d 335), as well as expressions of her "thoughts, feelings, opinions or emotions” regarding the crime
 
 (see,
 
 Executive Law § 632-a [1]).
 

 Consequently, petitioners instituted this CPLR article 78 proceeding asserting that the book was not subject to the statute, that the proceedings judging it so violated Federal due process guarantees and that the statute abridged Federal and State guarantees of free speech (US Const 1st, 14th Amends; NY Const, art I, § 8). Supreme Court converted the proceeding to a declaratory judgment action and, after examining the book’s contents, found that the statute applied to the work and that respondents had not violated petitioners’ due process rights. The court held further that the statute was constitutional because it had only an incidental effect on speech and because the governmental interest addressed by the statute outweighed petitioners’ State and Federal rights
 
 (see,
 
 143 Misc 2d 999). The Appellate Division affirmed on Supreme Court’s opinion.
 

 
 *719
 
 We agree that the book is subject to the statute and that the proceedings did not violate petitioners’ due process rights. We also agree petitioners’ free speech claims should be rejected. Our analysis differs from that of Supreme Court, however. We conclude that the statute is content-based and imposes a direct burden on speech: it singles out a category of speech based on subject matter and imposes special burdens on that category. Thus, the statute must be strictly scrutinized and unless it serves a compelling governmental purpose and is narrowly tailored to accomplish that purpose, it is invalid.
 

 I
 

 In 1966 the Legislature enacted article 22 of the Executive Law to establish the Crime Victims Board (L 1966, ch 894, § 1). Recognizing that many victims of crime and their dependents suffer disability, incur financial hardship or become dependent upon public assistance as a result of criminal acts, the Legislature enacted the statute to establish a mechanism whereby the State would provide victims with financial assistance. It has since been extensively amended to provide crime victims and witnesses with rehabilitation programs, crisis intervention and other counseling services, and to facilitate funding from other sources, both public and private
 
 (see,
 
 Executive Law § 631-a; L 1985, ch 688, § 12; L 1986, ch 263, § 6). The statute authorizes respondent Board to investigate and determine claims of crime victims, to grant them emergency awards before final determination of the claims (Executive Law § 630) and grant final awards not to exceed $30,000 (§ 631). A victim is defined as a person who suffers "personal, physical, mental, or emotional injury, or pecuniary loss as a direct result of the crime” (§ 621 [5]; § 632-a [10] [a]) and payment to them is authorized even though the criminal is not apprehended or convicted (§ 631). The awards are free from execution or attachment by creditors, except those having claims for treating injuries resulting from the crime (§ 632). Upon payment, the State is subrogated, to the extent of the award, to any right of action against the criminal (§ 634). Decisions of the Board are subject to judicial review pursuant to CPLR article 78 (§ 629).
 

 Section 632-a, the subject of this proceeding, was originally enacted in 1977 (L 1977, ch 823) and has been amended several times to narrow and clarify its scope and establish the priority of claims. The section provides that those contracting
 
 *720
 
 with "any person or the representative or assignee” of any person accused or convicted of a crime in New York, "with respect to the reenactment of such crime” or for "the expression of such * * * person’s thoughts, feelings, opinions or emotions regarding such crime” shall submit a copy of the contract to the Crime Victims Board. If the Board determines that the criminal’s work comes within the statute, any moneys owing under the contract must be paid to the Board. The funds are deposited in escrow for the benefit of the victims or legal representatives of the victims of the crime. An expanded Statute of Limitations is necessary because the tort Statute of Limitation might expire before the work is undertaken or generates income. Thus, section 632-a provides that claims may be asserted at any time within five years after the escrow is established. To be entitled to funds the claimant/victim must institute an action in a civil court, recover a judgment for damages and then apply to the Board for satisfaction of it from the escrowed moneys. Upon dismissal of the criminal charges or acquittal, the Board must immediately pay over any funds in the escrow to the accused.
 

 The statute strictly regulates the disbursement of the proceeds. They are to be used, first, to pay for the criminal’s legal representation and, in the discretion of the Board and after notice to the victims of the crime, for the necessary expenses for producing the moneys. The total amount disbursed for such purposes may not exceed 20% of the amount in the fund available to satisfy civil judgments obtained by victims of the crime. The balance of the fund is payable, in order of priority, to satisfy subrogation claims of the State (not exceeding one half of the civil judgment obtained by the victims), the civil judgment of the victims and finally, other creditors of the criminal. The remainder, if any, is paid to the criminal at the end of five years. Moneys in the fund are not subject to execution, attachment, levy or lien except as provided in the statute and certain actions taken by the criminal to avoid the statute’s provisions are declared void.
 

 The statute was enacted in response to public outrage over the 1977 Son of Sam murders and news reports that the killer was being offered substantial sums of money for the exclusive rights to his story. The bill set up the procedures described to ensure that criminals would not profit from their crimes before the victims of those crimes had an opportunity to obtain compensation
 
 (see,
 
 Mem of Senator Emmanuel R. Gold,
 
 *721
 
 1977 NY Legis Ann, at 267; Assembly Bill Mem Re: A 9019, Bill Jacket, L 1977, ch 823).
 

 II
 

 "Stranger in Two Worlds” was written by Harris after her conviction and imprisonment in Bedford Hills Correctional Facility. During her term, she worked at the Children’s Center of the prison with the children of the inmates in that facility and decided that it would be important to bring to the attention of the public the problem of imprisoned mothers trying to maintain the bonds with their offspring. Accordingly, she suggested that the mothers collect some of the letters written by the children and publish them. Eventually she put the collection together and enlisted the services of a book agent to help her sell the project to a publisher. The publishers were not interested in a book containing only the letters, however, and some suggested that the project would be more salable if Harris were to write her own story as well. She then expanded the book to include the story of her life, including her life with Tarnower, his murder, and her prison experiences. On March 19, 1985, MacMillan signed an agreement with Harris to publish the proposed work and paid her an advance of $50,000. She used the money for taxes and attorneys’ fees connected with her criminal trial and donated the balance to charitable programs at Bedford. Subsequently, after the book was completed and published, she established Children of Bedford, Inc. and assigned all future royalties to it for the benefit of the children of women in prison. Neither she nor the foundation have been paid any royalties for the book other than those originally advanced.
 

 Before publication, MacMillan submitted a copy of the agreement and the book to the Crime Victims Board and on July 28, 1986, the Board issued a proposed order declaring the book subject to Executive Law § 632-a. At petitioners’ request, an adjudicatory hearing was held after which the Board upheld its proposed order and determination and issued a final order, now under challenge, determining that the book was within the statute and requiring all moneys due under the agreement to be paid into escrow.
 

 ¡II
 

 Petitioners contend first that the Board erred in determin
 
 *722
 
 ing that "Stranger in Two Worlds” was subject to the statute because the material in the book relating to the reenactment of the crime constitutes only a small portion of the book and consists primarily of reprinted transcripts of trial testimony.
 

 In its final determination, the Board found that the book "contains both the author’s version of the re-enactment of her crime of which she was convicted as well as expressions of Jean Harris’ thoughts, feelings, opinions and emotions regarding the crime.” It cited specifically two chapters dealing with the Tarnower homicide and the trial, "Harrison, New York: The End of the Line” and "Westchester: The People vs. Jean Harris”. The Supreme Court agreed with the Board’s determination, finding that these two chapters make up the core of the work around which the narrative of Harris’s life story is structured — preceding chapters describe the forces and events leading up to the crime and following chapters tell of Harris’s experiences as a consequence of her conviction for Tarnower’s murder. We agree that respondents reasonably concluded the book was within the statute. Indeed, it is apparent from the preliminary negotiations between MacMillan and Harris and from the publicity surrounding publication that MacMillan believed the book’s commercial value rested on subject matter within the statute. Before accepting the book, MacMillan urged Harris to expand it to include the crime and, before publishing it, MacMillan advised the trade that Harris’s soon to be released book was "a spellbinding story of her life in and out of prison,” that the author kept a diary in prison "full of new facts about her relationship with Hy Tarnower, her lover for over a decade whom she ultimately murdered,” and stated that "Ms. Harris comes to terms with herself [in prison] and recounts why she murdered her lover.” Press reports originating from MacMillan characterized the book as "the crime of the century — by the woman convicted of committing it.”
 

 IV
 

 Petitioners further contend that the Board violated procedural due process by failing to give them proper notice of the offending passages and because the investigative and adjudicative functions are improperly joined in the Crime Victims Board.
 

 The procedures established by the Board, and followed in this case, are set forth in 9 NYCRR part 526. The Board first investigates to determine if the contract at issue comes within
 
 *723
 
 the statute. The results of the preliminary investigation are then incorporated into a proposed determination and notice is served upon the parties to the contract. An interested party has 30 days to request a hearing to challenge the proposed finding. If a hearing is requested, the chair assigns one or more Board members to conduct it and report to the full Board on the matter. The report and written findings of the Hearing Officer are considered by the Board and it issues a final determination containing the findings of fact and conclusions of law which support its decision.
 

 Addressing petitioners’ notice claim first, due process requires that the parties be afforded reasonable notice of the claims against them and an opportunity to be heard on those claims
 
 (see, Mullane v Central Hanover Trust Co.,
 
 339 US 306, 313-314;
 
 Matter of Fitzgerald v Libous,
 
 44 NY2d 660, 661). The proposed determination issued by the Board on July 29, 1986, contained a statement of the issues involved in the controversy, a detailed account of the facts which formed the basis for the Board’s proposed determination, including page references to various passages in the book, and stated that the passages were found to contain "both detailed reenactment as well as numerous expressions of Jean Harris’s thoughts, feelings, opinions and emotions regarding the crime for which she was convicted.” These preliminary findings were made available to petitioners prior to the administrative hearing and were sufficient to apprise them of the Board’s claims.
 

 Petitioners’ remaining due process claim rests on their contention that the Board improperly acted as both prosecutor and Judge by investigating the facts, issuing a proposed determination and order, holding a hearing on that determination and ultimately, upholding it. The practice of combining investigative, prosecutorial and adjudicative functions in a single administrative agency or board is not improper, however; statutes doing so are common
 
 (see, e.g.,
 
 Alcoholic Beverage Control Law § 119; Civil Service Law § 75 [2]; Labor Law § 100). Such arrangements do not, without more, violate due process by creating an unconstitutional risk of bias
 
 (Withrow v Larkin,
 
 421 US 35;
 
 Matter of Beres & Sons Dairy v Barber,
 
 75 AD2d 930, 931,
 
 affd
 
 52 NY2d 1026;
 
 see also, Matter of Buffalo Teachers’ Fedn. v Helsby,
 
 35 AD2d 318, 322). The petitioners must demonstrate that because of the practice the Board has been prejudiced by its investigation or for some reason is disabled from hearing and deciding the matter on the basis of
 
 *724
 
 the evidence
 
 (Withrow v Larkin, supra,
 
 at 55). The record in this case contains no such evidence.
 

 V
 

 Having concluded the statute was properly applied to the Harris book and the proceedings before the Board were regular, we turn to petitioners’ free speech claims.
 

 A
 

 The Board does not dispute that the book is protected speech under the First Amendment
 
 (see, Cox Broadcasting Corp. v Cohn,
 
 420 US 469, 492 ["the commission of crime(s) * * * are without question events of legitimate concern to the public”];
 
 cf., Chaplinsky v New Hampshire,
 
 315 US 568). It contends, however, that section 632-a has only an incidental effect on speech because the restrictions imposed do not prohibit criminals from speaking about their crimes nor do they prohibit publishers from publishing the criminal’s reenactment or discussion of the crimes. They merely insure that profits received by the criminal from doing so are first made available to compensate the victims of the crime — a purpose unrelated to the suppression of free expression
 
 (see, United States v O’Brien,
 
 391 US 367, 377).
 

 We conclude that the statute is content-based and imposes a direct burden on speech. Harris may write, and her publisher may publish, any literary work written by her without regulation unless the subject matter of the work deals with the crime of which she stands convicted (Executive Law § 632-a [1]). Because of that exception, however, both the publisher and the Board must scrutinize the work to determine whether the subject matter being addressed falls within the terms of the statute. If it does, the statute imposes a burden on the criminal’s speech by regulating the financial aspects of it
 
 (see, Meyer v Grant,
 
 486 US 414).
 

 In
 
 Meyer v Grant,
 
 the Supreme Court examined a Colorado statute that prohibited the payment of persons to circulate petitions for ballot initiatives. The Court concluded that the statute was subject to strict scrutiny because it imposed financial limitations which directly burdened political speech. It did so by limiting the number of voices who would convey the message expressed in the petitions and making it less likely that the number of signatures necessary to place the
 
 *725
 
 issue on the State ballot would be obtained. Parties were free to use volunteers to circulate their petitions, but they were prohibited from paying people to do so and that restriction, the Court held, limited their ability to make the issue the focus of State-wide discussion
 
 (Meyer v Grant, supra,
 
 at 422-423). A similar result follows for nonpolitical speech
 
 (see, Village of Schaumburg v Citizens for Better Envt.,
 
 444 US 620 [regulation of the financial aspects of charitable solicitation];
 
 Riley v National Fedn. of Blind,
 
 487 US 781;
 
 Secretary of State of Md. v Munson Co.,
 
 467 US 947 [same];
 
 Buckley v Valeo,
 
 424 US 1 [contribution limitations under Election Campaign Act constitutional but expenditure limitations violated First Amendment]).
 

 Executive Law § 632-a has a similar effect on speech by requiring the escrow of any profits paid to criminals for reenactment or depiction of their crimes and regulating distribution of those profits according to the statutory formula. Although the law does not foreclose the speaker’s message, it imposes an economic disincentive or penalty for delivering it
 
 (cf., Miami Herald Publ. Co. v Tornillo,
 
 418 US 241).
 

 Because the statute singles out a category of speech based on subject matter and imposes special burdens on that category, respondents must demonstrate that it serves a compelling State interest and is narrowly tailored to achieve that purpose
 
 (see, Arkansas Writers’ Project v Ragland,
 
 481 US 221, 231;
 
 Perry Educ. Assn. v Perry Local Educators’ Assn.,
 
 460 US 37, 45;
 
 Consolidated Edison Co. v Public Serv. Commn.,
 
 447 US 530, 540;
 
 First Natl. Bank v Bellotti,
 
 435 US 765, 786).
 

 B
 

 It is the declared policy of this State that financial assistance, counseling and retraining should be made available to crime victims to rehabilitate them physically, emotionally and occupationally for the injuries they have sustained at the hands of a criminal
 
 (see,
 
 Executive Law art 22).
 
 [1]
 
 Executive Law § 632-a serves this compelling interest by facilitating compensation for victims directly injured by the crime and also to victims of other crimes by freeing up public funds which would otherwise be used to compensate these victims
 
 *726
 
 under the general provisions of article 22. A corollary to this interest in ensuring victim compensation, is the State’s interest in having criminals, rather than taxpayers, bear the burden of compensating their victims whenever possible. Section 632-a furthers these interests by ensuring that in cases falling within its provisions the criminal will bear the financial burden of compensating the victim.
 

 If the only purpose of section 632-a was to compensate victims, however, petitioners’ contention that the State’s needs could be met by other, less burdensome means would be more persuasive. Manifestly, article 22 and the general civil procedures address that need. Section 632-a provides not only a method for victims to obtain compensation, however, it also meets other compelling governmental interests. First, it preserves the victim’s equitable right to assets earned by a criminal as a result of the victimization
 
 (compare,
 
 Executive Law § 631,
 
 with
 
 § 632-a). If there is no victim a necessary requirement for implementation of the statute is lacking, section 632-a does not apply and the criminal may discuss the crime without restraint
 
 (e.g., compare, Halmi v Crime Victims Bd.,
 
 NYLJ, June 5, 1986, at 12, col 3 [Sup Ct, NY County],
 
 affd on opn below
 
 128 AD2d 411 [prostitution is victimless crime]; and
 
 St. Martins Press v Zweibel,
 
 NYLJ, Feb. 26, 1990, at 25, col 1 [Sup Ct, NY County] [securities fraud based on leaking market information];
 
 with Simon & Schuster v Fischetti,
 
 916 F2d 777, and this case). But if there are victims and the criminal profits from reenactment or depiction of the crime, then the victims who have been injured by the criminal act, and the State, which has been called upon to render aid to those victims, should have the first claim to that money. They should be compensated before the criminal.
 

 Section 632-a also addresses another concern. Our laws are formulated to express not only the community’s standards of right and wrong, but also its views on the nature and the gravity of the wrong. To the extent that the law manifests those standards, respect for it is maintained. To that end, our statutes impose punishment and disabilities on those convicted of crime which reflect the nature and extent of the community’s denunciation of particular conduct
 
 (see, Gregg v Georgia,
 
 428 US 153, 184, n 30; for illustrations of disabilities
 
 see, e.g.,
 
 Election Law § 5-106; Public Officers Law § 30 [1] [e]). Section 632-a embodies the community’s belief that it is not only wrong for criminals to commit crimes and profit from
 
 *727
 
 them but also wrong for criminals to salt their victims’ wounds by profiting from the victimization without recompense to the victims.
 
 [2]
 

 Thus, the statute is a codification of the fundamental equitable principle that criminals should not be permitted to profit from their wrongs
 
 (see, Caplin & Drysdale v United States,
 
 491 US 617;
 
 Petrie v Chase Manhattan Bank,
 
 33 NY2d 846;
 
 Riggs v Palmer,
 
 115 NY 506, 511) and also an expression of the penological concept which provides that victims expect and are entitled to "retributive satisfaction” from our criminal justice system
 
 (see,
 
 Schafer,
 
 Restitution to Victims of
 
 Crime—
 
 An Old Correctional Aim Modernized,
 
 50 Minn L Rev 243, 244;
 
 see also, Landau v Vallen,
 
 895 F2d 888, 891 [recognizing equitable interest of victim to proceeds of crime]). The sponsor of the New York statute, expressed these interests well when he stated that: "[i]t is abhorrent to one’s sense of justice and decency that [a criminal] can expect to receive large sums of money for his story once he is captured — while [his victims] are dead [or] injured * * *. [T]he victim must be more important than the criminal” (Mem of Senator Emmanuel R. Gold, 1977 NY Legis Ann, at 267).
 

 These governmental interests have been recognized and implemented by similar statutes in approximately 40 American jurisdictions.
 
 [3]
 

 
 *728
 
 c
 

 Although the State has identified compelling reasons for imposing restrictions on the category of speech at issue here, this does not end the inquiry. We must determine whether New York’s statute is narrowly tailored to achieve these interests.
 

 Petitioner contends the governmental purposes are adequately fulfilled by existing tort laws and provisional remedies, particularly the attachment laws. The tort laws do not satisfactorily address the need, however. They require the commencement of an action within three years, a period during which there may be no assets to satisfy a judgment. Although a judgment once secured may remain in effect for 20 years, the victim has little incentive to seek relief if the criminal has no assets. Moreover, if the criminal does have assets, or subsequently acquires them, the victim would be required, if limited to tort remedies, to share those assets with general creditors.
 

 Nor do the existing attachment procedures solve the problem. CPLR article 62 provides that attachment is available upon commencement of an action, or immediately before it, if the debtor is either outside the State, or otherwise not amen.able to service, or if he has taken steps to defraud his creditors or frustrate the enforcement of a judgment
 
 (see,
 
 CPLR 6201). Because the remedy is prejudgment, an undertaking may be required of the plaintiff (CPLR 6212 [b]). These provisions address concerns wholly irrelevant to crime victims and the requirements for their use make them unsuitable to protect the needs of the crime victims now covered by Executive Law § 632-a. Even if the attachment laws were expanded to provide a remedy for crime victims, the provisions necessarily would operate much like Executive Law § 632-a if the statute was to serve the compelling State interests identified above.
 

 Petitioners also contend that the statute is underinclusive because it does not reach income earned from writing generally, income earned from other crime-related activities such as
 
 *729
 
 wages received by a convicted computer expert who subsequently obtains profitable employment as a result of illegally "bugging” computer networks, or after-acquired property of the criminal. Their argument misses the point. The statute was never intended to reach profits received solely as a result of the criminal’s notoriety. A criminal may earn income from writings on such subjects as prison life in general, as Harris has
 
 (see, Harris v Abate,
 
 NYLJ, Apr. 2, 1990, at 25, col 3 [Sup Ct, NY County]), or may subsequently obtain employment as an "expert”, as petitioners’ hypothetical computer expert might. That financial success is the result of their newly advertised prominence or expertise, not their illegal act. By contrast, criminals covered by the statute had no marketable asset before the crime: they create, by illegal activity, a new product — a story — which becomes profitable in the retelling.
 

 Petitioners’ reference to after-acquired property fails for the same reason. Moneys received by a criminal from inheritance or other sources do not relate to the crime in which a victim has been injured. Manifestly, these assets are available to victims by the customary legal remedies, but they do not come within the purpose of Executive Law § 632-a which is intended to protect the victim’s equitable claim to profits earned by a criminal from speech made possible by reason of their victimization.
 

 Finally, petitioners contend that the law is unconstitutional because it excessively inhibits other contracting parties, such as publishers, who want to publish material about the crimes. But there is nothing in the law which prohibits noncriminal authors from writing about the crime or publishers from publishing their works. They may write and publish about the crime in general or from the perspective of the perpetrator. Nor is there anything in the statute which prevents publishers from profiting in full from publishing any work about the crime. No moneys are withheld from its earnings. The publisher is required only to submit a copy of the contract to the Board, and once it is finally determined that the statute applies, it must turn over moneys owed to the criminal under that contract to prevent the dissipation of the profits (Executive Law § 632-a [1]).
 

 We conclude that section 632-a is narrowly tailored to meet the State’s compelling interest in securing a victim’s equitable right to be compensated from moneys earned by a criminal as a result of the victimization. It creates a unique
 
 *730
 
 and identifiable resource and preserves it for the benefit of victims directly injured by a crime to compensate them for the damages sustained, gives them priority over the criminal’s other creditors and extends the time within which a claim to the proceeds may be asserted by a victim. The statute regulates only the criminal’s receipt of money, not the right to speak about the crime and it does not impose a forfeiture of all profits — it merely delays payment (§ 632-a [11] [e]). Indeed, the statute provides an incentive to speak about the crime by granting the criminal first priority to the funds for legal fees and production expenses (§ 632-a [8]) and directing payment of the balance remaining to the criminal after other authorized claims are satisfied. Moreover, the statute does not prohibit anyone else from telling or publishing the criminal’s story. The reach of the law is limited to its purpose.
 

 D
 

 Petitioners further assert that the law is void for vagueness. An enactment is void for vagueness if its prohibitions are not clearly defined. The Constitution does not require " '[M]eticulous specificity’ ”, however
 
 (see, Grayned v City of Rockford,
 
 408 US 104,110, quoting from
 
 Esteban v Central Mo. State Coll,
 
 415 F2d 1077, 1088). As long as the law provides fair warning to those within its scope, clear standards for the enforcement of the law, and is not so uncertain in terms as to lead to self-censorship it will be upheld
 
 (see, Grayned v City of Rockford, supra,
 
 at 108-109;
 
 see also, Ward v Rock Against Racism,
 
 491 US 781, 793-794;
 
 Kovacs v Cooper,
 
 336 US 77, 79).
 

 The terms of Executive Law § 632-a are sufficiently clear to meet this standard. Persons accused of or convicted of a crime and individuals contracting with those persons are covered by the statute
 
 (see,
 
 Executive Law § 632-a [1], [10] [b]). It applies to any contract involving "the reenactment of such crime, by way of a movie, book, magazine article, tape recording, phonograph record, radio or television presentation, live entertainment of any kind, or from the expression of such accused or convicted person’s thoughts, feelings, opinions or emotions regarding such crime” (§ 632-a [1]). A person complies with its requirements by submitting a copy of the contract to the Board and, once the Board determines that the contract falls within the purview of the statute, by paying over to the Board any moneys which would otherwise, by
 
 *731
 
 terms of such contract, be owing to the criminal or his representatives. The scope of the Board’s enforcement powers are limited both by statute and regulation
 
 (see,
 
 § 632-a [1]-[12]; 9 NYCRR part 526). Thus, the statute clearly delineates the class of individuals within its scope, the events that trigger its application, and the acts required for compliance and enforcement.
 

 Petitioners nevertheless attempt to illustrate the statute’s vagueness by questioning the applicability of the statute to victimless crimes or to material which contains only a fleeting reference to the crime. They maintain that publishers do not have a clear idea from the language of the statute whether these circumstances would be covered by it. Such questions are matters for interpretation. Indeed, the courts have already resolved some of them
 
 (see, ante,
 
 at 726). The Constitution does not require that a law be drafted with such specificity that it leaves no room for interpretation nor is it void for vagueness merely because situations may exist in which it should not be applied
 
 (see, Grayned v City of Rockford, supra,
 
 at 108-110).
 

 VI
 

 Finally, petitioners claim that the statute violates the free speech provision contained in the State Constitution. Inasmuch as we conclude the statute does not unconstitutionally abridge petitioners’ Federal rights, we are obliged to examine the State Constitution to determine whether it provides greater protections
 
 (see, Town of Islip v Caviglia,
 
 73 NY2d 544, 555-556).
 

 New York’s Free Speech Clause is embodied in article I, § 8. It contains language that is more expansive than its Federal counterpart and we have at times interpreted it in a manner that is more protective of free expression than the First Amendment to the Federal Constitution
 
 (see, e.g., O’Neill v Oakgrove Constr.,
 
 71 NY2d 521, 528-529;
 
 People ex rel. Arcara v Cloud Books,
 
 68 NY2d 553;
 
 see generally, Bellanca v New York State Liq. Auth.,
 
 54 NY2d 228, 234-235). Petitioners assert that we should do so here because where free expression is at stake, article I, § 8 of the New York Constitution demands a genuinely close fit between the asserted State interest burdening free speech and the restrictions imposed by law (citing
 
 People ex rel. Arcara v Cloud Books,
 
 68 NY2d 553,
 
 supra).
 
 They maintain that Executive Law § 632-a does not meet this standard because it is seriously underinclusive and
 
 *732
 
 inadequately designed to address the general problem of victim compensation. As we have noted, petitioners’ basic premise is erroneous. The statute is not designed to compensate all victims, only those who possess claims to the proceeds earned by the criminal as a result of their victimization. Moreover, assuming without deciding, that article I, § 8 does require some type of "genuinely close fit” between the statute and its purpose, this requirement is no more burdensome than requiring that the statute be narrowly tailored to meet its objective and section 632-a satisfies this test. .
 

 In sum, we find "Stranger in Two Worlds” is a publication subject to the provisions of Executive Law § 632-a, that respondent Board properly found it to be such and that the statute does not violate petitioners’ rights to free speech under either the Federal or State Constitution.
 

 Accordingly, the order of the Appellate Division should be affirmed, with costs.
 

 Chief Judge Wachtler and Judges Alexander, Hancock, Jr., and Bellacosa concur; Judges Kaye and Titone taking no part.
 

 Order affirmed, with costs.
 

 [1]
 

 . As such, the statute is but another manifestation of the constitutionally imposed obligation of the State and its subdivisions to aid the needy (NY Const, art XVII, § 1).
 

 [2]
 

 . The statute’s purpose is to compensate crime victims not to protect their sensibilities or those of the public by restricting offensive speech
 
 (cf., Texas v Johnson,
 
 491 US 397;
 
 Hustler Mag. v Falwell,
 
 485 US 46).
 

 [3]
 

 . The Federal statute is found in 18 USC §§3681, 3682. The Senate report supporting the Federal statute, after noting the statute was patterned after New York’s law, identified a similar policy supporting the Federal law; the purpose is "to preclude criminals from profiting from the glorification of their misdeeds * * *. Any profits reaped from illegal acts are more appropriately used to provide restitution to the direct victim of the crime, or, alternatively, to victims of crime in general” (S Rep No. 98-497, reprinted in 1984 US Code Cong & Admin News, at 3612-3613).
 

 Respondents’ brief identifies the following States as having similar laws: Ala Code §§ 41-9-80 — 41-9-84; Alaska Stat § 12.61.020; Ariz Rev Stat Annot § 13-4202; Ark Stat Annot § 16-90-308; Cal Civ Code § 2225; Colo Rev Stat §§ 24-4.1-201 — 24-4.1-207; Conn Gen Stat Annot § 54-218; Del Code Annot, tit 11, §§ 9101-9106; Fla Stat Annot § 944.512; Ga Code Annot §§ 17-14-30 — 17-14-32; Haw Rev Stat Annot §§ 351-81 — 351-88; Idaho Code § 19-5301; Ill Annot Stat, ch 70, para 411; Ind Code Annot §§ 16-7-3.7-1 — 16-7-3.7-6; Iowa Code Annot § 910.15; Kan Stat Annot §§ 74-7319 — 74-7321; Ky Rev Stat Annot § 346.165; La Rev Stat Annot §§ 46:1831-46:1839; Md Annot Code, art 27, § 764; Mass Gen Laws Annot, ch 258A, § 8; Mich Comp Laws Annot § 780.768; Minn Stat Annot § 611A.68; Miss Code Annot §§ 99-38-1 — 99-38-11; Mo Annot Stat § 595.045 (14); Mont Code Annot § 53-9-104 (1) (d); Neb
 
 *728
 
 Rev Stat §§ 81-1836 — 81-1842; Nev Rev Stat Annot § 217.265; NJ Stat Annot §§ 52:4B-26 — 52:4B-30; Ohio Rev Code Annot §§ 2969.01-2969.06; Okla Stat Annot, tit 22, § 17; Ore Rev Stat § 147.275; Pa Stat Annot, tit 71, § 180-7.18; RI Gen Laws §§ 12-25.1-1 — 12-25.1-12; SC Code Annot §§ 15-59-40 — 15-59-80; SD Code Annot § 23A-28A-1; Tenn Code Annot §§ 29-13-201 — 29-13-208 (1990); Tex Civ Code Annot, art 8309-1, §§ 1-18; Wash Rev Code Annot §§ 7.68.200-7.68.280; Wis Stat Annot § 949.165 (2); Wyo Stat § 1-40-112 (d).