638 A.2d 93

**J. Joseph CURRAN, Jr.**

v.

**Ronald W. PRICE.**

**No. 76, Sept. Term, 1993.**

Court of Appeals of Maryland.

March 14, 1994.

**154**

J. Joseph Curran, Jr., Atty. Gen. (Ralph S. Tyler, Deputy Atty. Gen., and Mary O'Malley Lunden, Asst. Atty. Gen., all on brief), Baltimore, for petitioner.

Timothy Umbreit (Umbreit & Resnick on brief), Baltimore, for respondent.

Steven F. Reich (David B. Isbell, Leslye A. Herrmann, Covington & Burling, all on brief), Washington, D.C., and Susan Goering, American Civ. Liberties Union Foundation of Maryland, on brief), Baltimore, amicus curiae.

Argued before MURPHY, C.J., RODOWSKY, McAULIFFE,* CHASANOW, KARWACKI, ROBERT M. BELL, JJ., and CHARLES E. ORTH, Jr., Judge of the Court of Appeals (retired), Specially Assigned.

MURPHY, Chief Judge.

This case focuses upon Maryland's so-called "Son of Sam" statute, Maryland Code (1957, 1992 Repl.Vol. and 1993 Cum. Supp.) Art. 27, § 764, which was enacted to prevent criminals from profiting from their own crimes through "notoriety of crimes contracts," defined in § 764(a)(5) as a contract with respect to

"(i) The reenactment of a crime by way of a movie, book, magazine article, tape recording, phonograph record, radio or television presentation, or live entertainment of any kind;

---

* McAuliffe, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

"(ii) The expression of the defendant's thoughts, feelings, opinions, or emotions regarding a crime involving or causing personal injury, death, or property loss as a direct result of the crime; or

"(iii) The payment or exchange of any money or other consideration or the proceeds or profits that directly or indirectly result from a crime, a sentence, or the notoriety of a crime or sentence."

Section 764(b) requires that a "person" who enters into a notoriety of crimes contract with a "defendant" must "submit a copy of the contract or summary of the terms of an oral agreement to the Attorney General . . . and . . . [p]ay over to the Attorney General any moneys or other consideration . . . which would otherwise be owing to the defendant." Section 764(a)(3) defines "person" as "a natural person, a firm, corporation, partnership, association, or other legal entity."

Section 764(a)(2) defines a "defendant" as "a person charged with or convicted of a crime in this State involving or causing personal injury, death, or property loss as a direct result of the crime." Section 764(a)(4) defines the term "victim" to mean a person "who suffers personal injury, death, or property loss as a direct result of crime."

Section 764(c)(1) and (2) require that the Attorney General mail to a "victim" of the defendant's crime a notice that the Attorney General has a copy of the contract and shall determine after the passage of 30 days, but before the expiration of 180 days from receipt of the contract, whether the contract is a "notoriety of crimes contract." It further provides that the Attorney General may render a decision after 180 days "for cause."

Section 764(c)(3) creates a rebuttable presumption that the contract is a notoriety of crimes contract but permits the "defendant" to establish to the "satisfaction of the Attorney General" that the subject matter of the contract only tangentially or incidentally relates to the crime.

Section 764(d) provides that a "person" may not conceal the existence of a notoriety of crimes contract or "make or receive payments" under such a contract.

Section 764(n) provides that any person aggrieved by a determination of the Attorney General may seek judicial review.

Section 764(p) authorizes the Attorney General to institute injunctive proceedings against a "person" who violates or threatens to violate any provision of § 764. Section 764(o) provides that any person who willfully fails to submit a copy of the contract to the Attorney General, or to pay over to the Attorney General any moneys or other consideration as required by the statute, shall be subject to certain civil monetary penalties, as set forth in the statute.

# I

Ronald W. Price (Price), a former Anne Arundel County high school teacher, was indicted on March 5, 1993 for criminal violations, including sexual child abuse and unnatural and perverted practices committed upon former students.[1] After Price's indictment and prior to his trial, the case received widespread attention, due in large part to the fact that Price appeared on national television talk shows acknowledging that he had engaged in sexual relationships with several of his female high school students. He also granted interviews to various local and national news media. In at least one of these interviews he stated that he had entered into a contract to sell "his story."[2] In response to that statement, and pursuant to § 764, an Assistant Attorney General wrote to Price's counsel inquiring whether Price had, in fact, entered into a contract that might be covered by the statute, and, if so,

---

1. Price was convicted of both charges on September 8, 1993 and was sentenced to 26 years imprisonment.

2. In a *Washington Post* article dated June 26, 1993 it was reported that Price indicated that he "signed an option to tell his story to a Hollywood movie producer."

with whom and for what consideration. Price responded through counsel that he had entered into a contract for his "life story," but refused to produce a contract or summary of any oral agreement, maintaining that § 764 was unconstitutional and in any event that the contract was only tangentially related to the crimes. Believing that the only basis for commercial interest in Price's life story was the criminal conduct with which he was charged, and therefore that it was most likely that any contract Price made would be covered by § 764, the Attorney General filed a "Complaint for Injunctive Relief" against Price in the Circuit Court for Anne Arundel County. The complaint recited that Price's "intentional concealment of and failure to submit to the Attorney General any contract for his life story, including his alleged criminal activity" violates Article 27, § 764. The Attorney General sought an interlocutory injunction, pending final adjudication of the case, requiring Price to submit the contract to him, together with any payments received under the contract. The complaint also sought "a final binding declaration of rights of the parties," followed by a permanent injunction.

The court (Lerner, J.) denied the Attorney General's prayer for injunctive relief and declared that § 764 was "unconstitutional and unenforceable." In so acting, the court determined that § 764 was unconstitutionally overinclusive on its face and violated the principles of the First Amendment. It noted that under § 764(a)(5)(ii) a "notoriety of crimes contract" was one respecting "the expression of the defendant's thoughts, feelings, opinions or emotions regarding a crime." Consequently, the court held that § 764 is a content-based regulation of speech which must be justified by a compelling government interest and narrowly tailored to further that interest. The court found that, while the State clearly has a compelling interest to prevent criminals from profiting from their crimes, and to compensate victims, § 764 swept so broadly as to reach forms of expression which the State had no compelling interest to regulate.

The State appealed to the Court of Special Appeals. We granted certiorari prior to review by the intermediate appel-

late court to consider the question presented by the State in its certiorari petition, i.e., whether it was constitutional under § 764 to require Price "as a person charged with serious crimes to submit to the Attorney General for review any notoriety of crimes contract." 331 Md. 719, 629 A.2d 720. In its petition for certiorari, the State urged that we "resolve definitively the constitutionality of § 764."

## II

Notwithstanding the question presented in its petition, the Attorney General argues that it is unnecessary for us to reach the issue of whether the entire statute is unconstitutional. Instead, he maintains that until the contract is produced and he is able to determine whether it is covered by the statute, any broad determination of the statute's constitutionality is premature. The Attorney General contends that any analysis of constitutionality should await a full and complete factual record. He maintains that constitutional issues do not arise when the Attorney General seeks merely to obtain a contract to determine the statute's applicability. He argues that the State is entitled to obtain information about a criminal defendant's proposed activity even if it enjoys First Amendment protection. He likens the requirement to produce the contract to a "time, place, and manner" restriction in which demonstrators must tell the State of a planned demonstration and apply for a permit to demonstrate. Moreover, it is maintained that there is little, if any, "speech" involved in producing the contract, and thus any incidental limitations on First Amendment freedoms are justified by the State's interest in ensuring that criminals not profit from their crimes. The State asserts that Price's obligation to produce the contract, the Attorney General's determination of the statute's applicability to any submitted contract, the right to judicial review of the Attorney General's decision, and his authority to seek injunctive review, are all "procedural steps" which must be exhausted before any constitutional issues should be reached. Alternatively, the argument is advanced that, in the event a constitutional review is necessary, we should conclude that § 764 is constitutional

because it is a content-neutral statute, narrowly tailored to further an important government interest.

Price contends that the statute is unconstitutional, but puts forth no legal arguments in support of his contention. The American Civil Liberties Union, appearing as amicus curiae (amicus), urges that the statute is a content-based restriction which sweeps too broadly, unconstitutionally burdening speech that is protected by the First Amendment. It posits that the production requirement and subsequent review by the Attorney General constitute a prior restraint on speech which lacks all the procedural safeguards necessary to make it constitutionally permissible. In addition, amicus suggests that the statute covers works by defendants whose crimes caused *any* property loss or injury, no matter how minimal, thereby resulting in the forfeiture of a defendant's speech-related earnings. Also, amicus observes, the statute deprives defendants of their earnings regardless of whether the victim of their crime makes a claim on the escrow fund as unclaimed funds may be given to victims of unrelated crimes.

## III

Courts have the power and the duty to determine the constitutionality of legislation. *Barnes v. Meleski*, 211 Md. 182, 186, 126 A.2d 599 (1956). In reviewing the constitutionality of Maryland's statute, we are guided by the Supreme Court's decision in *Simon & Schuster v. New York Crime Victims Board*, 502 U.S. 105, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991). Maryland's statute was based originally upon the New York statute, N.Y.Exec.Law § 632-a (McKinney 1982 and Supp.1991), which the Supreme Court found unconstitutional in *Simon & Schuster*.[3] The original Maryland statute was

---

**3.** The original New York statute provided in pertinent part:

"Every person, firm, corporation, partnership, association or other legal entity contracting with any person ... accused or convicted of a crime in this state, with respect to the reenactment of such crime, by way of a movie, book, magazine article, tape recording, phonograph record, radio or television presentation, live entertainment of any kind,

subsequently amended to its current form in 1992 in response to that decision. To be determined on a proper record is whether the amendment was successful in removing the constitutional infirmity existing in the original New York and Maryland statutes.

The Supreme Court invalidated the New York "Son of Sam" statute on the ground that it imposed a financial burden only on speech of a specified content, *Simon & Schuster, supra,* 502 U.S. at ——, 112 S.Ct. at 508, and because it was not narrowly drawn to serve a compelling state interest in ensuring that victims are compensated by those who harm them, and that criminals not profit from their crimes, *id.* at 510–11. The Court found that the statute was "significantly overinclusive" in that it applied to works on any subject, as long as they expressed the author's thoughts or recollections of the crime, "however tangentially or incidentally." *Id.* at ——, 112 S.Ct. at 511. In addition, the New York statute applied to persons who admitted in a work that they had committed a crime, whether or not they were ever accused or convicted. *Id.* The Court noted that these provisions encompassed a wide range of works, many by prominent figures.[4]

---

or from the expression of such accused or convicted person's thoughts, feelings, opinions or emotions regarding such crime, shall submit a copy of such contract to the board and pay over to the board any moneys which would otherwise, by terms of such contract, be owing to the person so accused or convicted...." N.Y.Exec.Law § 632–a (1) (McKinney 1982).

4. The Court noted that "had the Son of Sam law been in effect at the time and place of publication, it would have escrowed payment for such works as The Autobiography of Malcolm X, which describes crimes committed by the civil rights leader before he became a public figure; Civil Disobedience, in which Thoreau acknowledges his refusal to pay taxes and recalls his experience in jail; and even the Confessions of Saint Augustine, in which the author laments 'my past foulness and the carnal corruptions of my soul,' one instance of which involved the theft of pears from a neighboring vineyard.... A list of prominent figures whose autobiographies would be subject to the statute if written is not difficult to construct: The list could include Sir Walter Raleigh, who was convicted of treason after a dubiously conducted 1603 trial; Jesse Jackson, who was arrested in 1963 for trespass and resisting arrest after attempting to be served at a lunch counter in North Carolina; and

It was the purpose of the Maryland legislature, in amending § 764, to make its provisions content-neutral and remedy the problem of overbreadth. To this end, the amendments to § 764(a)(2) narrowed the definition of defendant to a person charged with or convicted of a crime. In addition, the amendments added language to the original subsection (b) which broadened the description of applicable contracts to include not only those with respect to reenactment of a crime or the expression of the defendant's thoughts, feelings, opinions or emotions regarding the crime, but also those with respect to "the payment or exchange of any money or other consideration or the proceeds or profits that directly or indirectly result from a crime, a sentence, or the notoriety of a crime or sentence." § 764(a)(5)(iii).

As we see it, while the language of § 764(a)(5)(iii) does not expressly target speech, its addition does not appear to negate the content-based nature of the language in subsections (a)(5)(i) and (ii). These subsections still define a notoriety of crimes contract by the content of the work to which it relates, specifically "the reenactment of a crime" or "the expression of the defendant's thoughts, feelings, opinions, or emotions regarding a crime." Moreover, these subsections still require the Attorney General to consider the subject matter of the work in determining whether the contract falls under the statute.

 In evaluating a statute for content-neutrality, the primary question is whether the government seeks to regulate speech because it disagrees with the message conveyed. *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989). A regulation of speech is content-neutral if it is " '*justified* without reference to the content of the regulated speech.' " *Id.* at 791, 109 S.Ct. at 2753 (quoting, with emphasis, *Clark v. Community for Crea-*

Bertrand Russell, who was jailed for seven days at the age of 89 for participating in a sit-down protest against nuclear weapons." *Id.*

*tive Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3068, 82 L.Ed.2d 221 (1984)).

The Attorney General argues that § 764 is justified without reference to the content of speech because its true purpose is not to prevent criminals from communicating about their crimes, but to prevent them from making financial profit from their crimes while their victims go uncompensated. It is, however, beyond question that to deny compensation for certain speech will chill such speech. In *Riley v. National Federation of the Blind of N.C.,* 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988), the Supreme Court found unconstitutional a statute which, *inter alia,* limited fees professional fundraisers could charge. The Court there noted that the statute's effect was to chill speech and drive professional fundraisers out of the state. *Id.* at 794, 108 S.Ct. at 2676. The Attorney General also argues that § 764's provisions are based not on the State's disagreement with the message in the relevant works, but on the fact that financial gain may be derived therefrom. But as the Supreme Court has stated, " '[t]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic.' " *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 230, 107 S.Ct. 1722, 1728, 95 L.Ed.2d 209 (1987) (quoting *Consolidated Edison Co. v. Public Service Comm'n of New York,* 447 U.S. 530, 537, 100 S.Ct. 2326, 2332, 65 L.Ed.2d 319 (1980)). Moreover, the Supreme Court has " 'long recognized that even regulations aimed at proper governmental concerns can restrict unduly the exercise of rights protected by the First Amendment.' " *Simon & Schuster, supra,* 502 U.S. at ——, 112 S.Ct. at 509 (quoting *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue,* 460 U.S. 575, 592, 103 S.Ct. 1365, 1375, 75 L.Ed.2d 295 (1983)).

The principal justification for Maryland's statute hinges on the State's desire to ensure that criminals not profit from their crimes while their victims remain uncompensated. Yet, the statute's language, specifically that in subsections (a)(5)(i) and (ii), appears to be content-based in that it requires the Attor-

ney General to analyze the content of the work in order to determine its applicability to the statute.

■ Content-based statutes are presumptively inconsistent with the First Amendment because they "raise[ ] the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace." *Simon & Schuster, supra*, 502 U.S. at ——, 112 S.Ct. at 508. Such statutes therefore warrant strict judicial scrutiny. *Consolidated Edison Co., supra*, 447 U.S. at 536, 100 S.Ct. at 2332.

■ We explained in *State v. Sheldon*, 332 Md. 45, 58, 629 A.2d 753 (1993), that the presumption against constitutionality of content-based statutes is not absolute. The Supreme Court has recognized exceptions to this presumption when, by way of example, a State proscribes a particular form of speech which falls under a class of speech that is entirely proscribable, such as obscenity or defamation. *R.A.V. v. City of St. Paul, Minnesota*, —— U.S. ——, ——, 112 S.Ct. 2538, 2545, 120 L.Ed.2d 305 (1992). If the "basis for the content discrimination consists of the very reason the entire class of speech at issue is proscribable," there is "no significant danger of idea or viewpoint discrimination." *Id.* at ——, 112 S.Ct. at 2545. While the State could, for example, prohibit one mode of "fighting words" and not another, it could not single out certain fighting words for their message. *Id.* at ——, 112 S.Ct. at 2549. Another exception, more relevant to this case, arises when a seemingly content-based statute has content-neutral intent, aiming only at the "secondary effects" of the targeted speech; such a statute is " '*justified* without reference to the content of the regulated speech.' " *Ward, supra*, 491 U.S. at 791, 109 S.Ct. at 2753 (quoting, with emphasis, *Clark, supra*, 468 U.S. at 293, 104 S.Ct. at 3069); *see also City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 49, 106 S.Ct. 925, 929, 89 L.Ed.2d 29 (1986). And the appropriate inquiry when reviewing such statutes is whether the statute is designed to serve a "substantial government interest" and allows for "reasonable alternative avenues of communication." *Renton, supra*, 475 U.S. at 50, 106 S.Ct. at 930.

*Renton* involved a zoning ordinance requiring that theatres specializing in "adult" films be located a certain distance from residential areas, churches, parks and schools. While ac- knowledging that the statute treated these theatres differently from other theatres based on the content of the films shown, the Court concluded that the ordinance was not aimed at the content of the films but at their "secondary effects" on the community, such as reduced property values. 475 U.S. at 49, 106 S.Ct. at 929. *Ward* involved a municipal noise regulation which limited sound volume at outdoor concerts by requiring that all performers use city-owned sound mixing equipment and that a technician hired by the city control the sound mixing equipment at every concert. The Court concluded that although the ordinance gave the technician control over the quality of the artistic expression, the purpose of the statute was not to control artistic expression but to control noise levels and maintain the character of the area in which the concerts took place. 491 U.S. at 792, 109 S.Ct. at 2754. Moreover, the Court observed that the city technician deferred to artists in any creative decisions concerning sound mix and that all performers who had used the city's equipment had been completely satisfied. *Id.* at 792–93, 109 S.Ct. at 2754–55. Therefore the statute was reviewed under the less stringent test applicable to governmental regulation of time, place and manner of protected speech. *Id.* at 798–99, 106 S.Ct. at 2757–58.

The Court in *Simon & Schuster* expressly declined to address the State's contention that the New York statute was content-neutral under the "secondary effects" exception it recognized in *Renton* and *Ward, supra.* It said:

"Because the Son of Sam law is so overinclusive we need not address the Board's contention that the statute is content neutral under ... [*Renton* and *Ward*]. In these cases we determined that statutes were content neutral where they were intended to serve purposes unrelated to the content of the regulated speech, despite their incidental effects on some speakers but not others. Even under *Ward* and *Renton*, however, regulations must be narrowly tailored

to advance the interest asserted by the State.... A regulation is not narrowly tailored—even under the more lenient tailoring standards applied in *Ward* and *Renton*—where, as here, a substantial portion of the burden on speech does not serve to advance the State's content-neutral goals. Thus whether the Son of Sam law is analyzed as content neutral ... or content based ... it is too overinclusive to satisfy the requirements of the First Amendment." 502 U.S. at —— n. 1, 112 S.Ct. at 511 n. 1 (citations omitted).

The Court therefore evaluated the New York statute under a stricter standard because it created a "financial disincentive to create or publish works of a particular content. In order to justify such differential treatment, 'the State must show that its regulation is necessary to serve a compelling state interest and is narrowly drawn to achieve that end.'" *Simon & Schuster, supra,* 502 U.S. at ——, 112 S.Ct. at 509 (quoting *Arkansas Writers' Project Inc., supra,* 481 U.S. at 231, 107 S.Ct. at 1728).

Therefore, under *Simon & Schuster,* if the Maryland statute is overbroad to the extent that a substantial portion of the burden it places on speech does not advance the State's interests—preventing criminals from profiting from crimes and compensating victims of crimes—then it would not survive a First Amendment challenge.

Amicus argues that the statute's overbreadth results primarily from its broad definition of "notoriety of crimes contracts," combined with the procedures it sets forth for review of contracts by the Attorney General.

The provisions regarding review by the Attorney General were added by the legislature when it amended § 764's definition of applicable contracts in an effort to cure the unconstitutional overbreadth found by the Supreme Court in the original New York statute. *See* Floor Report on H.B. 1207, Senate Judicial Proceedings Committee (1992 Session). Subsection (c)(2) provides that the Attorney General shall render a decision as to whether a contract is a notoriety of crimes contract "after the passage of 30 days, but before the expiration of 180

days from receipt of the contract or moneys"; it also provides that the Attorney General may render a decision after 180 days "for cause." Subsection (c)(3) sets forth the presumption that a contract is a notoriety of crimes contract, which can be rebutted if the defendant establishes "to the satisfaction of the Attorney General" that the contract's subject matter relates "only tangentially or incidentally" to the crime.

The Attorney General suggests that the limiting language of subsection (c)(3) cures the overbreadth problems in the definitional language of subsections (a)(5)(i) and (ii), because it removes from the statute's reach any contracts whose subject matter relates only tangentially or incidentally to the crime.

Amicus disagrees, observing that the statute requires that contracts for works on any subject which contain a defendant's thoughts, feelings, opinions or emotions about a crime, however remotely related to the subject of the work, must still be submitted to the Attorney General, thus burdening a substantial portion of speech without furthering the State's interests. This burden, amicus contends, arises in the length of time in which the person submitting the work must forego earnings while awaiting a determination, and in the statutory presumption in favor of the State.

The language defining notoriety of crimes contracts in subsections (a)(5)(i) and (ii) is virtually identical to the language invalidated by the Supreme Court in *Simon & Schuster*. *See* 502 U.S. at —— —— ——, 112 S.Ct. at 504-05. Although, as the Attorney General asserts, the limiting language of subsection (c)(3) would provide a means of escape for the famous works of literature which the Court noted would be swept into the definition's overbroad grasp, these works would nonetheless be burdened during the review process. The question becomes, then, whether the burden is acceptable—that is, whether the submission and review requirement is both necessary and narrowly tailored to serve the State's interest without impermissibly burdening speech unrelated to the advancement of that interest.

A statute is overbroad to the extent that, by its very existence, it inhibits constitutionally protected speech. *Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 798–99, 104 S.Ct. 2118, 2125–26, 80 L.Ed.2d 772 (1984). But "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible of an overbreadth challenge." *Id.* at 800, 104 S.Ct. at 2126. The overbreadth must be substantial, i.e., there must be "realistic danger that the statute itself will significantly compromise" recognized First Amendment rights of parties not before the court for it to be facially challenged as overbroad. *Id.* The Supreme Court found the New York statute to be overinclusive in the sense that it "reache[d] a wide range of literature that does not enable a criminal to profit from his crime while a victim remains uncompensated." *Simon & Schuster, supra,* 502 U.S. at ——, 112 S.Ct. at 511.

If § 764 is overbroad, the essence of such overbreadth lies in the initial review process—assuming, of course, that contracts for works which do not ultimately meet the definition of notoriety of crimes contracts will be freed eventually from all statutory restraint. The question, therefore, is whether the initial restraint can be fully justified by the State as necessary to further its important interests.

Although § 764 does not restrain individuals from writing or publishing works when those works include references to their crimes, it does bar them from receiving any earnings from such works, at least during the period of review by the Attorney General. If this restriction is a prior restraint on speech, the State bears a heavy burden in justifying its imposition, for "any system of prior restraint of expression . . . bear[s] a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963)). A prior restraint of unprotected speech must include sufficient procedural safeguards to avoid unduly suppressing protected speech. *Freedman v. State of Maryland,* 380 U.S. 51, 58, 85 S.Ct. 734, 738, 13 L.Ed.2d 649 (1965). Generally, such a restraint is acceptable

only when the speech sought to be barred falls outside First Amendment protection. *See Freedman, supra; Near v. State of Minnesota,* 283 U.S. 697, 716–17, 51 S.Ct. 625, 631–32, 75 L.Ed. 1357 (1931).

In *Riley, supra,* 487 U.S. at 801–02, 108 S.Ct. at 2680, the Supreme Court held that a statute which prohibited paid fundraisers from soliciting funds without first obtaining a license, but allowed unpaid volunteer fundraisers to solicit immediately upon applying for a license, was invalid because it did not include procedural safeguards necessary to ensure that the professional fundraisers' First Amendment rights were not violated. Amicus maintains that this makes clear that to be an invalid prior restraint a regulation need not prohibit speakers from speaking; a regulation which prohibits speakers from receiving compensation for their efforts is also an invalid prior restraint. The speakers in *Riley* were not barred from speaking; they could still solicit funds on a voluntary basis, as the authors of the works in the instant case may still communicate their views without the benefit of compensation. But the Court did not say that any restraint in the form of the licensing requirement was impermissible. It acknowledged that although speakers generally were not required to obtain a license to speak, states could impose valid time, place and manner restrictions upon them. 487 U.S. at 802, 108 S.Ct. at 2680. But, it said, "Even assuming that the State's interest [in regulating those who solicit money] does justify requiring fundraisers to obtain a license before soliciting, such a regulation must provide that the licensor 'will, within a specified brief period, either issue a license or go to court.'" *Id.* at 802, 108 S.Ct. at 2680 (quoting *Freedman, supra,* 380 U.S. at 59, 85 S.Ct. at 738). Therefore, such a restriction may be acceptable if accompanied by sufficient procedural safeguards to ensure that administrative discretion is not unlimited.

In *Freedman, supra,* the Supreme Court set forth procedural requirements for prior restraints on speech in a motion picture censorship system. The Court held that the State must bear the burden of proving that a film is unprotected expression. It further held that while the State may require

advance submission of films, this requirement may not be administered in such a way as to make the State's decision final; only a procedure requiring a judicial determination constitutes a valid restraint. And finally, the procedure must assure a "prompt final judicial determination." 380 U.S. at 58–59, 85 S.Ct. at 738–39. The *Freedman* Court noted there was no judicial participation in the procedure set forth in the statute because the censor's decision was final unless the film's exhibitor "assume[d] the burden of instituting judicial proceedings and persuading the court that the film [was] protected expression." *Id.* at 59–60, 85 S.Ct. at 739–40. The Court further noted that there was no assurance of prompt judicial review, and observed that a delay of six months before final appellate review of a censorship decision was too long. *Id.* at 55, 85 S.Ct. at 737.

Section 764's process of review would appear to conflict with the standards set forth in *Freedman* in several respects. First, while *Freedman* makes clear that the State bears the burden of proving that the work falls within the regulatory sweep of the statute, § 764 imposes upon the defendant the burden of proving that his or her speech falls outside the statute. As earlier stated, § 764(c)(3) provides for a "rebuttable presumption" that the contract is a notoriety of crimes contract, and the defendant bears the burden of rebutting this presumption by "establishing to the satisfaction of the Attorney General" that the work which is the subject of the contract "only tangentially or incidentally" relates to the crime. Moreover, under § 764, any restraint imposed by the Attorney General is final unless the defendant or publisher seeks judicial review. And if judicial review is sought, it may not take place within a time frame that would be considered acceptable under *Freedman*. While the Court in *Freedman* considered a period of six months until final appellate review to constitute an impermissible delay, subsection (c)(2)(i) provides for up to six months for administrative review by the Attorney General prior to any judicial review. Subsection (c)(2)(ii) provides for an unlimited extension of that period "for cause." It is thus clear that this statutory scheme imposes a

heavy burden upon protected expression and it may well be argued that the process of review provides insufficient procedural safeguards to withstand constitutional scrutiny.

We address amicus' final concerns as to the statute's overbreadth. It points to the statute's apparent applicability to works in which a defendant refers to a crime involving minimal property damage or personal injury, yet treats it not as incidental but rather as a pivotal event in the writer's life. Although the loss to any victim was negligible, the writer's total earnings from the work apparently could nonetheless be escrowed. Amicus points to this application as evidence that the statute is not tailored narrowly to the State's interest in compensating victims for their losses. The Attorney General counters that such a minor crime would not likely provide notoriety for a defendant to profit from the crime, but that, regardless, the State's interest is not dependent upon the degree of injury to the victim.

However unlikely the above situation may be, it is possible, and subsection (a)(5)(ii) appears to encompass such a work. But, as we earlier noted, "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible of an overbreadth challenge," *Taxpayers For Vincent, supra,* 466 U.S. at 800, 104 S.Ct. at 2126, and this application, alone, would appear insufficient to do so.

And finally, § 764(*l*) provides that funds escrowed which are unclaimed by victims of a defendant's crime will be transferred eventually to a general victim's compensation fund. Although this requirement is not tailored narrowly to ensure that a defendant not profit from the crime at the expense of the particular victim of that crime, it does not appear that such is required under *Simon & Schuster.* As the Court stated in that case, "We need only conclude that the State has a compelling interest in depriving criminals of the profits of their crimes, and in using these funds to compensate victims." —— U.S. at ——, 112 S.Ct. at 510.

### IV

 We have long adhered to the policy of not deciding constitutional issues unnecessarily. *Simms v. State*, 288 Md. 712, 725, 421 A.2d 957 (1980). If a decision on a constitutional question is not necessary for proper disposition of the case, we will not reach it. *Comm'r of Labor & Ind. v. Fitzwater*, 280 Md. 14, 19, 371 A.2d 137 (1977). Therefore, before reaching a decision on the basis of § 764's constitutionality, we first determine whether the action brought by the Attorney General against Price is authorized by the statute.

The Attorney General seeks to restrain Price from continuing to violate subsection (d) by concealing the existence of what may be a notoriety of crimes contract. That subsection provides that "a person may not:

(1) Conceal the existence of a contract described in subsection (b) of this section; or (2) Except as otherwise provided in this section, make or receive payments under a contract described in subsection (b) of this section."

Subsection (b) provides that a "person who enters [into] a notoriety of crimes contract with a defendant shall:

(1) Submit a copy of the contract or summary of the terms of an oral agreement to the Attorney General; and (2) Pay over to the Attorney General any moneys or other consideration ... which by the terms of the contract would otherwise be owing to the defendant...."

The Attorney General claims that subsections (b) and (d) clearly authorize him to obtain the contract from Price and that the trial judge should have enforced those provisions against Price. To us, however, the issue is not so clear. Therefore, a review of the principles of statutory construction is appropriate.

 The cardinal rule of statutory interpretation is to ascertain and carry out the legislature's true intention. *Condon v. State*, 332 Md. 481, 491, 632 A.2d 753 (1993). To do so, we look primarily to the words of the statute. *Id.* at 491, 632 A.2d 753. If the language of the statute is unambiguous, we

need not look elsewhere to ascertain legislative intent. *Wheeler v. State*, 281 Md. 593, 596, 380 A.2d 1052 (1977). Where the language is ambiguous, however, we are not limited to the words of the statute, but must often look to other sources. *Kaczorowski v. City of Baltimore*, 309 Md. 505, 514–15, 525 A.2d 628 (1987).

All parts of a statute are to be read together to determine intent, and reconciled and harmonized to the extent possible. *Condon, supra*, 332 Md. at 491, 632 A.2d 753. Where a statute may be susceptible of more than one meaning, we may consider the consequences of each interpretation and adopt that construction which avoids an unreasonable result. *Kaczorowski, supra*, 309 Md. at 513, 525 A.2d 628. If a statute is susceptible of two reasonable interpretations, one of which would involve a decision as to its constitutionality, the preferred construction is that which avoids the determination of constitutionality. *Schochet v. State*, 320 Md. 714, 725, 580 A.2d 176 (1990). A statute must be construed in context, and the plainest language ·may be governed by the context in which it appears. Legislative reports and other legislative history may help provide the appropriate context. *NCR Corp. v. Comptroller*, 313 Md. 118, 125, 544 A.2d 764 (1988); *Kaczorowski, supra*, 309 Md. at 515, 525 A.2d 628.

Here we are required to apply these principles to § 764(b) and (d) to determine whether either or both subsections give the Attorney General the authority to obtain a suspected notoriety of crimes contract directly from a defendant.

Subsection (b), in plain and unambiguous language, requires persons entering into contracts with defendants to submit the contract to the Attorney General if it falls within the definition of notoriety of crimes contracts. Nothing in this language requires defendants to submit such contracts to the Attorney General. And where the language of a statute is unambiguous we will not add words to reflect an intent not evidenced in the words of the statute. *Condon, supra*, 332 Md. at 491, 632 A.2d 753. We conclude, therefore, that

subsection (b) does not countenance obtaining the contract from Price.

Subsection (d) is not so clear, however. It prohibits "persons" from concealing the existence of such contracts and from making or receiving payments under such contracts. Neither this subsection nor the definitions subsection contained in (a) of the statute provides any restriction as to persons covered by the subsection.[5] It is the Attorney General's position that subsection (d) applies to all persons, including the defendant, and the fact that the subsection prohibits not only the making but the receipt of payments supports this interpretation. Nevertheless, longstanding principles of statutory construction require that subsections (b) and (d) be read together and reconciled if possible, *Condon, supra,* 332 Md. at 491, 632 A.2d 753, and here arises the ambiguity. Subsection (b) applies exclusively to persons contracting with a defendant, and not to defendants. Therefore, we must determine whether subsection (d) can be applied to prohibit a defendant from concealing a contract that the defendant is not required to produce under subsection (b). In view of the ambiguity in the statute, we look to other sources to glean legislative intent, including legislative reports. *NCR Corp., supra,* 313 Md. at 125, 544 A.2d 764; *Kaczorowski, supra,* 309 Md. at 514–15, 525 A.2d 628. In this regard, the legislative history underlying enactment of § 764 discloses in the bill analysis by the Senate Judicial Proceedings Committee that subsection (d): "Prohibits a person from concealing the existence of a contract with a defendant or making or receiving payments except as provided in this section." Thus, the committee recognized a distinction between a "person" and a "defendant," suggesting that the provision refers only to a person other than the defendant. This conclusion is bolstered by the following additional language in the committee's bill analysis:

---

**5.** Subsection (a)(3)'s definition of "person" is expansive rather than restrictive. However, while the definition of "person" in subsection (a)(3) suggests strongly an intent to include all possible entities which might be contracting with defendants, it suggests no intent to include defendants themselves.

"The bill prohibits a person from concealing the existence of a contract with a defendant or making or receiving payments under the contract except as authorized under the bill, and makes void any action taken by a defendant to defeat the purpose of the bill."

Again, the language suggests a distinction between a "person" and a "defendant," reinforced by the fact that the second clause expressly refers to conduct by defendants alone.[6]

 That the distinction between a "person" and a "defendant" was intended by the General Assembly is clear from the separate definitions given those terms in the definitions section of the statute. Thus, we find these distinctions to be persuasive indicators that the legislature intended subsection (d) not to apply to defendants, but only to persons contracting with defendants. This interpretation renders subsection (d) consistent with subsection (b).

 Considering the consequences of each interpretation, the construction limiting subsection (d) to nondefendants is an interpretation that is more reasonable and more consistent with public policy. To require a criminal defendant to produce, before trial, a contract for a work related to the criminal act for which the defendant will be tried is simply inconsistent with public policy protecting the rights of the accused. Moreover, to require production by the defendant raises serious questions concerning the defendant's constitutional privilege against self-incrimination. The constitutional privilege applies only to "testimonial communication" which incriminates. *Baltimore City Dept. of Social Serv. v. Bouknight,* 493 U.S. 549, 554, 110 S.Ct. 900, 904, 107 L.Ed.2d 992 (1990) (quoting *Fisher v. United States,* 425 U.S. 391, 408, 96 S.Ct. 1569, 1579, 48 L.Ed.2d 39 (1976)). When the government demands production of a thing, the privilege may still be

---

6. The language of the second clause refers to § 764(h), which provides:

"Any action taken by a defendant, including an execution of a power of attorney, creation of corporate entities, or designation of the defendant's interest, to defeat the purpose of this section shall be void as against public policy."

implicated because the act of production testifies to the "existence, possession or authenticity of the thing produced"; however, a person may not claim the privilege based on "incrimination that may result from the contents or nature of the thing demanded." *Bouknight, supra,* 493 U.S. at 554, 110 S.Ct. at 904. Therefore, it is only the testimonial nature of the act of production for which the privilege may be asserted.

The Supreme Court has held that the privilege may not be invoked to avoid complying with a State's regulatory regime which advances public purposes unrelated to the enforcement of criminal laws. *See Shapiro v. United States,* 335 U.S. 1, 32–33, 68 S.Ct. 1375, 1391–92, 92 L.Ed. 1787 (1948) (no Fifth Amendment privilege attached to production of records defendant was required to keep for public inspection). The Court has, however, limited *Shapiro*'s applicability where the regulation at issue is directed to a group "inherently suspect of criminal activities" and falls in an "area permeated with criminal statutes." *Marchetti v. United States,* 390 U.S. 39, 45, 88 S.Ct. 697, 700, 19 L.Ed.2d 889 (1968) (quoting *Albertson v. Subversive Activities Control Board,* 382 U.S. 70, 79, 86 S.Ct. 194, 199, 15 L.Ed.2d 165 (1965))." In *Marchetti, supra,* and *Grosso v. United States,* 390 U.S. 62, 68, 88 S.Ct. 709, 713, 19 L.Ed.2d 906 (1968) the Court held that the provisions of federal wagering tax statutes could not be used to punish an individual who failed to register and pay taxes under the statute when the individual properly asserted the privilege against self-incrimination on the basis that, by registering, he would be providing information about his illegal gambling activities. *See also Haynes v. United States,* 390 U.S. 85, 98–99, 88 S.Ct. 722, 730–731, 19 L.Ed.2d 923 (1968) (a proper claim of constitutional privilege against self-incrimination provides a full defense to prosecutions for failure to register a firearm or possession of an unregistered firearm under federal statute where registration requirement is aimed principally at those who have obtained possession of a firearm without complying with other statutory requirements).

The Supreme Court reexamined this issue in *Bouknight, supra,* which involved a mother who invoked the privilege to

avoid complying with a court order to produce her child, who had been adjudicated as a child in need of assistance. The Court held that the mother, who was suspected of criminal acts against the child, could not invoke the privilege in refusing to produce the child because the child's care and safety became the object of the State's regulatory interests when he was adjudicated a child in need of assistance. 493 U.S. at 550, 110 S.Ct. at 902. The Court reasoned that when the State entrusted to the mother care of the child, subject to certain conditions, the mother, in accepting such care, submitted to the routine operation of the regulatory system with the incident obligation to permit inspection of the child. *Id.* The Court distinguished *Bouknight* from *Marchetti, supra,* noting that "persons who care for children pursuant to a custody order ... are hardly a 'selective group inherently suspect of criminal activities.'" *Bouknight, supra,* 493 U.S. at 556, 110 S.Ct. at 905 (quoting *Marchetti, supra,* 390 U.S. at 57, 88 S.Ct. at 707).

▪ Turning to the statute in the instant case, we cannot conclude that it falls within the type of "regulatory regime constructed to effect the State's public purposes unrelated to the enforcement of its criminal laws," envisioned by the Supreme Court in *Bouknight, supra,* 493 U.S. at 550, 110 S.Ct. at 902. Rather, it concerns an "area permeated with criminal statutes," *Marchetti, supra,* 390 U.S. at 45, 88 S.Ct. at 700 (quoting *Albertson v. Subversive Activities Control Board,* 382 U.S. 70, 79, 86 S.Ct. 194, 199, 15 L.Ed.2d 165 (1965)), and is thus more similar to *Marchetti, Grosso,* and *Haynes, supra.* Maryland's "Son of Sam" statute is codified within Article 27, the criminal law article of the Maryland Code. Its purpose is the amelioration of the effects of criminal behavior: the financial rewards to the criminal and the unrequited losses of the victim. And, unquestionably, it is aimed exclusively at a select group "inherently suspect of criminal activities." *Bouknight, supra,* 493 U.S. at 556, 110 S.Ct. at 905. We therefore hold that the State, in compelling a defendant to produce a contract under § 764, would implicate the defendant's constitutional privilege against self-incrimination if the act of production

would amount to testimony which would incriminate the defendant. Indeed, we do not see how a defendant can produce, at the State's behest, a contract which meets the description of a notoriety of crimes contract without thereby implicitly acknowledging the commission of a crime.

As we observed in *Police Comm'r v. Dowling*, 281 Md. 412, 379 A.2d 1007 (1977):

> "[W]here a statute is subject to two constructions, one of which will result in the legality and effectiveness of the statutory provision being construed . . . courts will prefer the construction which will result in its legality and effectiveness. We also have held that a statute will be construed so as to avoid a conflict with the Constitution whenever that course is reasonably possible."

*Id.* at 420, 379 A.2d 1007 (citations omitted) (quoting *Williams and Fulwood v. Director*, 276 Md. 272, 295, 347 A.2d 179, *cert. denied*, 425 U.S. 976, 96 S.Ct. 2178, 48 L.Ed.2d 801 (1975)).

In light of these principles, we shall not reach the constitutionality of § 764 on its merits. Instead, we decide only that the statute does not require a defendant to submit to the Attorney General a suspected notoriety of crimes contract, and consequently the suit against Price was not authorized by the statute. Therefore, the Circuit Court erred in addressing the constitutional issue raised by Price, and we shall vacate the judgment below and remand the matter to it with directions to dismiss the complaint as not within the authority of the Attorney General to institute.

In so concluding, we realize that it will be difficult for the Attorney General to obtain a contract where the identity of the other contracting party is not known. But the other party to the contract is required by the statute to produce it and, assuming the constitutionality of § 764, is subject to a severe penalty for failure to do so.

*JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY VACATED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO DISMISS THE ACTION AGAINST RONALD PRICE AS NOT AUTHO-*

*RIZED BY § 764 OF ARTICLE 27. COSTS TO BE PAID BY THE STATE OF MARYLAND.*