Marie BOUCHARD et al.

v.

Craig PRICE

No. 95–205–Appeal.

Supreme Court of Rhode Island.

May 5, 1997.

Rebecca Tedford Partington, Nicholas Gorham, Providence, for Plaintiff.

Robert B. Mann, Providence, for Defendant.

Present: WEISBERGER, C.J., and LEDERBERG, BOURCIER and FLANDERS, JJ.

## OPINION

LEDERBERG, Justice.

This case came before the Supreme Court on cross-appeals by the plaintiffs, Marie Bouchard, in her capacity as beneficiary of the estate of Joan Heaton; Steven Garofalo, in his capacity as the administrator of the estate of Joan Heaton; Mary Lou Bouchard, Raymond Bouchard, and Gail Zakalis, in their capacities as the brother and sisters of Joan Heaton; and Nancy Mayer, General Treasurer of the State of Rhode Island, ex rel. the above-named plaintiffs; and by the defendant, Craig Price. The plaintiffs have appealed the dismissal of their claims for wrongful death, unjust enrichment, and relief under the so-called Slayer's Act. The defendant has appealed the granting of the plaintiffs' motion for summary judgment on their sole remaining count seeking a declaration that the defendant is subject to the Criminal Royalties Distribution Act of 1983. The Attorney General for the State of Rhode Island has intervened, pursuant to Rule 24(d) of the Superior Court Rules of Civil Procedure, to argue that the Criminal Royalties Distribution Act is constitutional.

## Facts and Procedural History

On September 21, 1989, defendant, then aged fifteen, appeared before the Family Court and admitted sufficient facts to be adjudicated delinquent for the murders of Joan Heaton and her daughters, Jennifer and Melissa Heaton. *See State v. Price,* 672 A.2d 893, 894–95 (R.I.1996). On April 26, 1994, plaintiffs filed a complaint against defendant in the Superior Court in which they sought damages for wrongful death (counts 1 through 6), relief based upon a theory of unjust enrichment (count 7), a declaration that defendant was subject to the Criminal Royalties Distribution Act of 1983 (count 8), and a declaration preventing defendant from receiving any benefits or property as a result of the deaths of Joan, Jennifer, and Melissa Heaton (count 9).

Following a hearing on August 16, 1994, defendant's motion to dismiss was granted in respect to all counts except count 8. On February 24, 1995, plaintiffs' motion for summary judgment was granted on the sole remaining count. Thereafter, judgment was entered, and the parties filed these cross-appeals.

## Wrongful Death Claims

On appeal, plaintiffs contended that the trial justice erred in dismissing their wrongful-death claims on the grounds that the claims were barred by the statute of limitations. It is undisputed that plaintiffs brought their action for wrongful death against defendant more than four and one-half years after the deaths underlying their claims. Although G.L.1956 § 10–7–2 clearly provides that the statute of limitations in a wrongful-death action is three years, plaintiffs argued that the statute of limitations was tolled in this case. The plaintiffs have advanced two theories in support of their position.

■ First, plaintiffs contended that defendant's minority tolled the statute of limitations for wrongful death until three years after defendant reached the age of majority. The plaintiffs noted that, pursuant to G.L. 1956 § 9–1–19, the statute of limitations on civil actions does not run during a plaintiff's minority, and argued that, as a matter of "equity, symmetry and basic fairness," the statute of limitations should also not run "against those who have causes of action against minors." Section 9–1–19 provides an exception to the statute of limitations for disabled, including minor, plaintiffs in civil actions. The rationale for tolling the statute of limitations for a minor plaintiff is to safeguard the minor's right to bring civil actions that accrue during his or her minority until he or she reaches the age of majority, at which time the individual may decide whether to pursue such claims. We are of the opinion that no such analogous purpose would be served by tolling the statute of limitations in respect to minor defendants.

Moreover, we have previously held that § 9–1–19 does not toll the statute of limitations in a wrongful-death action. *Short v. Flynn*, 118 R.I. 441, 446–48, 374 A.2d 787, 790 (1977). In *Short*, we stated that because a claim for wrongful death was unknown at common law, chapter 7 of title 10 of the Rhode Island General Laws, entitled "Death by Wrongful Act," created an entirely new right of action that "cannot now be maintained except to the extent and in the manner provided in that Act." *Id.* at 443, 374 A.2d at 788. Therefore, under our holding in *Short*, the tolling provisions of § 9–1–19 are not applicable to plaintiffs' claims under the wrongful-death act.

■ Second, plaintiffs asserted that their wrongful-death claims were tolled during defendant's minority, while he was a "wayward" and "delinquent" minor within the exclusive, original jurisdiction of the Family Court. The Family Court has exclusive, original jurisdiction in proceedings "[c]oncerning any child residing or being within the state who is: (i) Delinquent; (ii) Wayward; (iii) Dependent; (iv) Neglected; or (v) Mentally defective or disordered." G.L.1956 § 14–1–5. A minor who is adjudicated delinquent remains within the Family Court's jurisdiction until he or she reaches the age of twenty-one. Section 14–1–6. The intent of the Legislature in granting exclusive, original jurisdiction to the Family Court is "to preclude * * * attaching criminal responsibility to juvenile offenders for the doing of the criminal act and thereby to protect a child under the prescribed age by adjudging him [or her] a wayward or delinquent child rather than entering a judgment of conviction on the criminal complaint." *State v. Cook*, 99 R.I. 710, 712, 210 A.2d 577, 579 (1965). Clearly, the purpose of the legislative grant of exclusive jurisdiction to the Family Court is to protect a delinquent juvenile from the adult criminal justice system, and not to shield such a juvenile from civil liability.

The plaintiffs also argued that the Family Court's exclusive jurisdiction over defendant divested the Superior Court of jurisdiction to hear a civil claim against defendant during his minority. The plaintiffs' assertion regarding the Superior Court's lack of jurisdiction over a delinquent minor is undercut by legislation that recognizes the right of a crime victim to petition the Family Court to "divulge the name and address of the juvenile accused of committing the crime solely for the purpose of allowing the victim to commence a civil action against the juvenile and/or his parents to recover for damages sustained as a result of the crime." Section 14–1–66. This Court has held that "[t]he clear legislative intent behind § 14–1–66 is to allow victims to recover, via a civil action, damages suffered at the hands of a juvenile offender." *Matter of Falstaff Brewing Corp., Re: Narragansett Brewery Fire*, 637 A.2d 1047, 1050 (R.I.1994).

We are of the opinion, therefore, that plaintiffs were not precluded from filing a civil suit in Superior Court against defendant during his minority. Consequently, the trial justice properly dismissed plaintiffs' wrongful-death claims on the grounds that they were barred by the statute of limitations.

### Claim for Unjust Enrichment

■ The plaintiffs next contended that the trial justice erred by dismissing their claim

for unjust enrichment. This Court has held that "actions brought upon theories of unjust enrichment and quasi-contract are essentially the same." *R & B Electric Co. v. Amco Construction Co.,* 471 A.2d 1351, 1355 (R.I. 1984). Furthermore, it is well settled that

"in order to recover under quasi-contract for unjust enrichment, a plaintiff is required to prove three elements: (1) a benefit must be conferred upon the defendant by the plaintiff, (2) there must be appreciation by the defendant of such benefit, and (3) there must be an acceptance of such benefit in such circumstances that it would be inequitable for a defendant to retain the benefit without paying the value thereof." *Anthony Corrado, Inc. v. Menard & Co. Building Contractors,* 589 A.2d 1201, 1201–02 (R.I.1991) (citing *R & B Electric Co.,* 471 A.2d at 1355–56).

In the case before us, plaintiffs have failed to allege facts to support a claim of unjust enrichment. The only purported benefits to defendant are profits that plaintiffs anticipate defendant might obtain by selling the rights to his story at some unspecified time in the future. Even if this Court were to accept these speculative profits as a benefit to defendant, we cannot say that such benefit was conferred upon defendant by plaintiffs. Therefore, we hold that the trial justice did not err in dismissing plaintiffs' claim for unjust enrichment.

### Claim under the Slayer's Act

■ The plaintiffs next contended that the trial justice erred in dismissing their claim under the so-called Slayer's Act, G.L.1956 chapter 1.1 of title 33. The plaintiffs have urged this Court to "construe the broad scope of Rhode Island's Slayer's Act [as] indicative of a legislative intent that *no* criminal shall profit by his crime, under *any* circumstances." In support of their position, plaintiffs noted that § 33–1.1–15 provides that "[t]his chapter * * * shall be construed broadly in order to effect the policy of this state that no person shall be allowed to profit by his or her own wrong."

"Well-established canons of statutory construction delegate to this court the function and duty as final arbiter on questions of statutory construction." *Falstaff Brewing Corp.,* 637 A.2d at 1049. In construing a statute, this Court "has the responsibility of effectuating the intent of the Legislature by examining a statute in its entirety and giving the words their plain and ordinary meaning." *Id.* Consequently, we are constrained to read § 33–1.1–15 within the context of the act as a whole.

■ Section 33–1.1–2 of the Slayer's Act specifically provides that "[n]either the slayer nor any person claiming through him or her shall in any way acquire any property or receive any benefit as the result of the death of the decedent." The remaining sections specifically exclude a slayer from receiving any of the decedent's property through the laws of intestacy (§ 33–1.1–3), a will (§ 33–1.1–4), tenancy by the entirety (§ 33–1.1–5), joint tenancy (§ 33–1.1–6), reversionary interest (§ 33–1.1–7), interest subject to a life estate (§ 33–1.1–8), contingent remainder (§ 33–1.1–9), power of appointment (§ 33–1.1–10), and insurance proceeds (§ 33–1.1–11). It is clear that the Slayer's Act was intended to exclude a slayer from acquiring any property that was formerly held by a slain decedent. The act does not address property or benefits received by the slayer from other sources, nor do we construe the act to apply to individuals who have no right to acquire property through the decedent. Because the Slayer's Act is inapplicable in the instant case, the trial justice did not err in dismissing plaintiffs' claim under this statute.

### Criminal Royalties Distribution Act

On cross-appeal, defendant argued that the trial justice erred in determining that defendant was a "criminally responsible person" within the meaning of the Criminal Royalties Distribution Act of 1983 (criminal royalties act or act), G.L.1956 chapter 25.1 of title 12, and in upholding the constitutionality of the act. The criminal royalties act establishes a mechanism whereby profits that a criminally responsible person would otherwise collect from the commercial exploitation of a felony are diverted to a criminal royalties fund from which victims of the crime may claim reimbursement for damages suffered as a result

of the crime. The act defines its critical terms as follows:

> *Criminally responsible person:* "a person who has been convicted of a felony committed within the state of Rhode Island which caused another person to suffer personal injury or loss of property, or who has been adjudicated not guilty by reason of insanity after a trial on a charge of such an offense, or who has voluntarily admitted the commission of such an offense." Section 12–25.1–2(6).

> *Commercial exploitation:* "any publication, reenactment, dramatization, interview, depiction, explanation, or expression through any medium of communication which is undertaken for financial consideration. The term includes, but is not limited to, a movie, book, magazine or newspaper article, tape recording, still photograph, radio or television program, live presentation, or reproduction or presentation of any kind." Section 12–25.1–2(3).

These concepts are melded in § 12–25.1–3(a), which provides that any person or legal entity contracting with a criminally responsible person for the commercial exploitation of the crime must supply to the General Treasurer of the State of Rhode Island a copy of the contract and that such a contracting entity must make payments otherwise payable to such person instead to the General Treasurer. Specifically, it states:

> "Every person, firm, corporation, partnership, association, or other legal entity contracting with a criminally responsible person * * * regarding the commercial exploitation of the events and circumstances constituting and/or surrounding and/or motivating the crime or alleged crime shall submit a copy of the contract, within ten (10) days of the making thereof, to the general treasurer and shall pay over to the general treasurer within ten (10) days of it becoming due and payable, any and all monies or other compensation which would otherwise by the terms of such contract be due and payable to or distributed at the direction of such person." Section 12–25.1–3(a).

The funds paid pursuant to this section are collectively known as the criminal royalties fund. Section 12–25.1–3(b).

The act requires payment into the fund of moneys that would otherwise go to criminally responsible persons. Claims may be brought against the fund and would be paid in the following priority: first to the state and the municipality for costs incurred in providing defense counsel for the criminally responsible person, and for investigative, and prosecution expenses, next to the victim or victims, then to creditors of the criminally responsible person, and finally, to the criminally responsible person after the above higher priority claims have been satisfied. Section 12–25.1–3(c)(1).

In challenging the act, defendant first argued that the act does not apply to him because he does not fall under the act's definition of a "criminally responsible person." We disagree. A criminally responsible person includes a person "who has voluntarily admitted the commission of [a felony.]" Section 12–25.1–2(6). It is undisputed that in Family Court defendant admitted facts sufficient to be adjudicated delinquent for the murders of the Heatons. These three acts would have constituted felonies had defendant been tried and convicted as an adult. In our opinion, the felonious nature of this behavior was not negated, for purposes of the criminal royalties act, by defendant's status as a juvenile at the time he committed the murders. Contrary to the assertion by our concurring colleague, this interpretation is supported by the provisions of the Family Court Act, G.L.1956 chapter 1 of title 14. It is indisputable that under § 14–1–66, a victim of crime may petition the Family Court to "divulge the name and address of the juvenile accused of committing the *crime* solely for the purpose of allowing the victim to commence a civil action against the juvenile and/or his parents to recover for damages sustained as a result of the *crime*." (Emphases added.) *See also* § 14–1–42(c) (referring to "the victim or victims of the *crime* for which the juvenile was certified and adjudicated" (emphasis added)). Clearly, the Legislature intended and contemplated that an act for which a juvenile is adjudged delinquent should be considered a crime in the

context of a *civil action* brought by a victim of the crime. *See In re Matter of Falstaff Brewing Corp.*, 637 A.2d at 1050 (purpose of § 14–1–66 to permit victim to recover damages from juvenile accused of committing a crime). We hold that such acts likewise retain their criminal character under the criminal royalties act, which is also a civil remedy for victims of crime.

■ The defendant next contended that the criminal royalties act is an unconstitutional restraint on free expression. In *Simon & Schuster, Inc. v. Members of the New York State Crime Victims Board*, 502 U.S. 105, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991), the United States Supreme Court was faced with a First Amendment challenge to New York's similarly structured statute, N.Y.Exec.Law § 632–a (McKinney 1982 and Supp.1991) (repealed 1992), enacted in 1977 in response to the publicity generated by the "Son of Sam" serial killings. The attention received by the perpetrator of the crimes, David Berkowitz, created the possibility that he could "cash in" on his notoriety while his victims and their families remained uncompensated. The Son of Sam law sought to foreclose this potential inequity by ensuring that money received by a criminal through media exploitation of his or her crime would " 'first be made available to recompense the victims of that crime for their loss and suffering.' " *Simon & Schuster*, 502 U.S. at 108, 112 S.Ct. at 504, 116 L.Ed.2d at 482 (quoting Assembly Bill Memorandum Re: A 9019, July 22, 1977, reprinted in Legislative Bill Jacket, 1977 N.Y.Laws, ch. 823).

The implementation of the Son of Sam law, as it existed at the time the United States Supreme Court reviewed it, was substantially similar to that of Rhode Island's criminal royalties act. Under the New York statute, any entity contracting with a person accused or convicted of a crime in New York for the depiction of the crime was required to submit a copy of the contract, and any payments otherwise due the accused or convicted person under the contract, to the New York State Crime Victims Board (board).[1] Section 632–a(1).

At issue in *Simon & Schuster* was a book entitled *Wiseguy*, detailing the life and criminal history of mobster Henry Hill (Hill). In 1987, the board determined that Simon & Schuster, the publisher of the book, had violated § 632–a by failing to submit its contract with Hill to the board and by making payments to Hill. The board ordered Simon & Schuster to produce the contract and to pay to the board all money due Hill under the contract, and ordered Hill to return to the board the payments he had already received to be held in escrow for victims of Hill's crimes. Simon & Schuster brought suit under 42 U.S.C. § 1983, challenging the statute as unconstitutional under the First Amendment and seeking an injunction against its enforcement. Both the Federal District Court and the Second Circuit Court of Appeals held the law to be constitutional. The United States Supreme Court granted certiorari. In *Simon & Schuster*, the Supreme Court held that the Son of Sam law was a content-based restriction on speech and thus applied strict scrutiny in its analysis. 502 U.S. at 116, 118, 112 S.Ct. at 508, 509, 116 L.Ed.2d at 487, 488. Although it recognized that the state has compelling interests in ensuring that victims of crime are compensated by those who harm them and that criminals do not profit from their crimes, *id.* at 118–19, 112 S.Ct. at 509–10, 116 L.Ed.2d at 488–89, the Supreme Court nonetheless struck down the Son of Sam law because it was not narrowly tailored to meet these compelling interests. *Id.* at 123, 112 S.Ct. at 512, 116 L.Ed.2d at 492.

According to the Court, the statute was significantly overinclusive because it "applies to works on *any* subject, provided that they express the author's thoughts or recollections about his crime, however tangentially or incidentally." *Id.* at 121, 112 S.Ct. at 511, 116

---

1. Although the New York law, unlike its Rhode Island counterpart, was not by its terms limited to crimes resulting in injury to persons or property, by the time *Simon & Schuster, Inc. v. Members of the New York State Crime Victims Board*, 502 U.S. 105, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991), was decided, the New York Court of Appeals had construed the statute as not applying to victimless crimes. *Id.* at 110, 112 S.Ct. at 505, 116 L.Ed.2d at 484 (citing *Children of Bedford, Inc. v. Petromelis*, 77 N.Y.2d 713, 570 N.Y.S.2d 453, 460, 573 N.E.2d 541, 548 (1991)).

L.Ed.2d at 490. The Court noted that had the statute been in effect at the applicable time and place, payments for such works as *The Autobiography of Malcolm X,* Thoreau's *Civil Disobedience,* and Saint Augustine's *Confessions* would have been escrowed. *Id.* In the Court's opinion, the fact that the statute would have applied to works such as these demonstrated that the act "clearly reaches a wide range of literature that does not enable a criminal to profit from his crime while a victim remains uncompensated." *Id.* at 122, 112 S.Ct. at 511, 116 L.Ed.2d at 491. Thus, the statute was held to be unconstitutional.

The Court also identified a second problem with the Son of Sam law: no justification was offered for drawing "a distinction between * * * expressive activity and any other activity in connection with its interest in transferring the fruits of crime from criminals to their victims." *Id.* at 119–20, 112 S.Ct. at 510, 116 L.Ed.2d at 489. In other words, the statute's focus on profits derived from *expressive* activity "has nothing to do with the State's interest in transferring the proceeds of crime from criminals to their victims." *Id.* at 120, 112 S.Ct. at 510, 116 L.Ed.2d at 490. If the purpose of the act were solely to compensate victims from the profits derived from crime, there would be no reason to target only those profits from expressive activity. As the Court expressed it, the state has "little if any interest in limiting such compensation to the proceeds of the wrongdoer's speech about the crime." *Id.* at 120–21, 112 S.Ct. at 511, 116 L.Ed.2d at 490. Although it ultimately rested its decision on overinclusiveness grounds, the Court's commentary suggests that the statute also suffered from a problem of "underinclusiveness." *See post.*

In the case at bar, defendant argued that the criminal royalties act, like New York's Son of Sam law, violates the mandate of the First Amendment to the United States Constitution that "Congress shall make no law * * * abridging the freedom of speech, or of the press." "A statute is presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech." *Simon*

*& Schuster,* 502 U.S. at 115, 112 S.Ct. at 508, 116 L.Ed.2d at 486–87. On the basis of our review of the relevant case law, we are persuaded that the criminal royalties act is a content-based statute. Although it is true, as plaintiffs and the Attorney General have pointed out, that the United States Supreme Court has repeatedly stated that the "principal inquiry in determining content-neutrality * * * is whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys," *Turner Broadcasting System, Inc. v. F.C.C.,* 512 U.S. 622, 642, 114 S.Ct. 2445, 2459, 129 L.Ed.2d 497, 517–18 (1994) (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2754, 105 L.Ed.2d 661, 675 (1989)), the Court has tempered such pronouncements with the recognition that "the mere assertion of a content-neutral purpose [will not] be enough to save a law which, on its face, discriminates based on content." *Turner Broadcasting System, Inc.,* 512 U.S. at 642–43, 114 S.Ct. at 2459, 129 L.Ed.2d at 518. Thus, even if the purpose of the criminal royalties act—namely, that of compensating victims by utilizing the proceeds that a criminal has derived from the criminal activity—is content-neutral, we nevertheless must apply strict scrutiny if the statute on its face discriminates on the basis of content.

On this point the Supreme Court's reasoning in *Simon & Schuster* is instructive: "The Son of Sam law is * * * a content-based statute. It singles out income derived from *expressive activity* for a burden the State places on no other income, and it is directed only at works with a *specified content.*" 502 U.S. at 116, 112 S.Ct. at 508, 116 L.Ed.2d at 487. (Emphases added.) The criminal royalties act, like New York's law, applies only to expressive activity and thus might be considered underinclusive. Fruits of a crime derived from nonexpressive activity fall outside the sweep of the statute. Moreover, the act applies only to expressive activity *of a specified content.* In fact, the statute could not be enforced without first determining whether the content of a particular work fell within the regulated category. This singular focus on the content of an expressive activity rings First Amendment bells and places the

statute squarely within the category of a content-based regulation meriting strict scrutiny. Consequently, "the State must show that its regulation is necessary to serve a compelling state interest and is narrowly drawn to achieve that end." *Id.* at 118, 112 S.Ct. at 509, 116 L.Ed.2d at 488 (quoting *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 231, 107 S.Ct. 1722, 1729, 95 L.Ed.2d 209, 221 (1987)).

With regard to the first prong of the inquiry, the United States Supreme Court has authoritatively answered the question of whether such statutes as the Son of Sam law serve a compelling state interest. Although the Supreme Court left open the question of whether book royalties can properly be termed the profits of a crime, it concluded its interest analysis by determining that "the State has a compelling interest in depriving criminals of the profits of their crimes, and in using these funds to compensate victims." *Simon & Schuster,* 502 U.S. at 119, 112 S.Ct. at 510, 116 L.Ed.2d at 489. It is clear that Rhode Island's criminal royalties act serves the same compelling purposes identified by the United States Supreme Court as undergirding New York's Son of Sam law.

 In addressing the issue of whether the criminal royalties act is narrowly tailored to achieve these compelling state interests, we arrive at the inevitable conclusion that upon this constitutional shoal, the act must founder. The United States Supreme Court found New York's statute to be overinclusive because it "applies to works on *any* subject, provided that they express the author's thoughts or recollections about his crime, however tangentially or incidentally." *Id.* at 121, 112 S.Ct. at 511, 116 L.Ed.2d at 490. The major difference in inclusiveness between the Rhode Island and the New York statutes is that expression regulated by the Rhode Island statute must pertain to the felonious behavior for which the criminal was found guilty (*see ante*), whereas the expression regulated by the New York law could pertain to any crime, prosecuted or not. Al-

though this distinction is not insubstantial insofar as it ensures that the underlying crimes triggering the law in Rhode Island are serious and prosecuted, it fails nevertheless to alleviate the key problem that the Supreme Court identified in the New York law, namely, that even tangential or incidental references to a crime are brought within the ambit of the statute.

The Attorney General has argued that Rhode Island's criminal royalties act, unlike New York's law, applies only to "significant" commercial exploitations of a crime and that "a tangential or peripheral reference to a prior crime would not trigger [its] provisions." Although it is the duty of this Court to construe a duly enacted statute as constitutional if such a construction is reasonably possible, *Landrigan v. McElroy,* 457 A.2d 1056, 1061 (R.I.1983), we are compelled to recognize that the criminal royalties act fails to delimit its applicability to "significant" commercial exploitations. Rather, the plain language of the statute mandates that the act should apply to "any * * * expression," G.L. 1956 § 12–25.1–2(3), of "the events and circumstances constituting and/or surrounding and/or motivating the crime or alleged crime." Section 12–25.1–3(a). The United States Supreme Court's determination that nearly identical language was unconstitutional in *Simon & Schuster* compels our conclusion that the criminal royalties act cuts too broad a swath through the field of protected expression.[2]

Moreover, not only is the act overbroad because it affects all expressive activity and thus violates the First Amendment, it also suffers from underinclusiveness. Neither plaintiffs nor the Attorney General justified the act's applicability solely to expressive activity. The state's compelling interest in compensating victims from the proceeds of crime would be better served, for example, by making available to a victim *all* the criminal's assets, however and wherever derived. Such an expansion of the resources potentially available to a victim would avoid the statute's Achilles' heel of singling out only ex-

---

**2.** As one commentator has expressed it, *Simon & Schuster* "foretells the demise of all these criminal anti-profit provisions" similar to the Son of Sam law. Note, *Criminal Anti–Profit Statutes* *and the First Amendment: Simon & Schuster, Inc. v. New York Crime Victims Board, 112 S.Ct. 501 (1991),* 15 Harv.J.L. & Pub.Pol'y 1060, 1060 (1992).

pressive activity for a special burden. We note that victims of a crime may normally bring a civil action against the offender to recover damages.[3] After a judgment has been obtained, a victim may proceed against the defendant's assets, whether or not these assets represent royalties obtained from the commercial exploitation of the crime. The enforcement of such a civil judgment against a defendant's assets following a personal injury or property loss has not heretofore presented a First Amendment problem.

We conclude that the criminal royalties act is not narrowly tailored to serve the state's compelling interest in compensating victims of crime from the profits of crime. Moreover, the act's focus on profits derived from only expressive activity renders the act inconsistent with the First Amendment to the United States Constitution and thus renders it unconstitutional. Although the act contains a severability clause, § 12–25.1–12, the unconstitutional portion of the act is indispensable to the rest of the act and cannot be severed without destroying legislative intent. *See Landrigan,* 457 A.2d at 1061. The act is therefore declared invalid in its entirety.

In so holding, however, we agree [4] with the objective that "[n]o one [should] be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime." *Simon & Schuster,* 502 U.S. at 119, 112 S.Ct. at 510, 116 L.Ed.2d at 489 (quoting *Riggs v. Palmer,* 115 N.Y. 506, 22 N.E. 188, 190 (1889)). But however compelling our interest in achieving this laudable objective, we must uphold constitutional restrictions on the power of the state to regulate free expression.

In summary, therefore, for the foregoing reasons, we deny the plaintiffs' appeal and affirm the judgment dismissing counts 1 through 7 and count 9 of their complaint. The defendant's cross-appeal is sustained, and we vacate the declaratory judgment entered in favor of the plaintiffs. The case is remanded to the Superior Court with instructions to dismiss count 8 of the plaintiffs' complaint.

FLANDERS, J., concurs.

FLANDERS, Justice, concurring.

I concur in the result reached by the court and with the majority's affirmance of the Superior Court's dismissal of the plaintiffs' claims for wrongful death, for unjust enrichment, and for alleged violations of the Slayer's Act. However, I write separately because I respectfully disagree with the majority's conclusion that the Criminal Royalties Distribution Act (the criminal royalties act or the act), G.L.1956 chapter 25.1 of title 12, applies to juvenile defendants. Therefore, I do not believe that the court should declare the act to be unconstitutional be-

---

**3.** Under G.L.1956 § 9–1–2 of the General Laws, a crime victim may recover damages from the offender in a civil action regardless of whether a criminal complaint has been filed. *See Lyons v. Town of Scituate,* 554 A.2d 1034, 1036 (R.I.1989) (observing that prior to 1904 crime victims could not bring an action for injuries until after criminal proceedings had been instituted or a criminal complaint filed). Moreover, in the event that a defendant is convicted of a felony after a jury trial, a civil judgment is automatically entered by the trial court pursuant to G.L.1956 § 12–28–5 of the Victim's Bill of Rights, chapter 28 of title 12. A victim of the felony must still establish proof of damages in a judicial proceeding before recovering for the injury or loss.

**4.** We note that in the wake of *Simon & Schuster* the New York Legislature repealed the Son of Sam law, *see* 1992 New York Laws ch. 618, § 10, and replaced it with a new statute, *see* N.Y.Exec. Law § 632–a (McKinney 1996), designed to remedy the constitutional defects identified by the United States Supreme Court. The new statute no longer limits recovery to profits generated by expression of the crime but rather includes all profits generated by the crime. Section 632–a(1)(b). In addition, such profits are not automatically escrowed. *See Curran v. Price,* 334 Md. 149, 638 A.2d 93, 103 (1994) (discussing "heavy burden" imposed on speech by initial review process of Maryland's Son of Sam statute). Rather, any party providing or contracting to provide a profit from a crime to a person charged or convicted of the crime must notify the board of the payment or contract. Section 632–a(2)(a). *The board is then required to notify* victims of record, § 632–a(2)(b), who may bring a civil action to recover compensation. Section 632–a(3). The board, acting on behalf of the plaintiff and all other victims, may apply for all provisional remedies, including attachment and injunction, available to the plaintiff. Section 632–a(6). The statute now applies only to behavior constituting a felony. Section 632–a(1)(a).

cause in my judgment such a declaration is not indispensably necessary to the determination of this appeal. *See Town of Barrington v. Blake,* 532 A.2d 955, 955 (R.I.1987) (" 'this court has consistently followed the accepted general rule that it will not pass upon the constitutionality of an act of the legislature unless its determination is indispensably necessary to the determination of the cause' "). For this reason I would not reach the defendant's challenge to the constitutionality of the act but simply affirm the dismissal of the plaintiffs' claims under the act by holding that it is inapplicable to this defendant because of his status as a juvenile when he committed the acts for which he was adjudicated a delinquent.

The act attempts to regulate the commercial exploitation of crimes attributable to a " 'criminally responsible person,' " § 12–25.1–2(6). Such a person is defined as one "who has been convicted of a felony * * * which caused another person to suffer personal injury or loss of property, * * * or who has voluntarily admitted the commission of such an offense." *Id.* However, "this court has consistently held that an adjudication of delinquency is not deemed a criminal conviction, except as it may be considered by a sentencing justice within the Family Court." *In re Bernard H.,* 557 A.2d 864, 867 (R.I. 1989); *see also In re John D.,* 479 A.2d 1173, 1176 (R.I.1984) ("[a] finding of delinquency or waywardness in a juvenile proceeding is not the equivalent of a finding that the juvenile has committed a crime[; r]ather, a determination of delinquency is warranted when an act is committed that would amount to a felony if it had been committed by an adult"); *In re Michael,* 423 A.2d 1180, 1183 (R.I.1981) ("[a] juvenile is delinquent or wayward, not because the juvenile has committed a crime, but because the juvenile has committed an act that would be a crime if committed by a person not a juvenile and because the juvenile requires 'such care, guidance and control * * * as will serve the child's welfare and the best interests of the state' "). This principle is codified at G.L.1956 § 14–1–40(a):

"No adjudication upon the status of any child in the jurisdiction of the court shall operate to impose any of the civil disabilities ordinarily resulting from a conviction, nor shall any child be deemed a criminal by reason of that adjudication, nor shall that adjudication be deemed a conviction, nor shall any child be charged with or convicted of a crime in any court, except as provided in this chapter. The disposition of a child or any evidence given in the court shall not be admissible as evidence against the child in any case or proceeding in any other court, nor shall that disposition or evidence operate to disqualify a child in any future civil service application, examination, or appointment."

Therefore, although defendant here "admitted sufficient facts to be adjudicated delinquent on four charges of murder," *State v. Price,* 672 A.2d 893, 895 (R.I.1996), he did not—indeed, as a fifteen-year-old juvenile, he could not—admit to the commission of a felony.[5] Rather he admitted to the commission of offenses "which, if committed by an adult, would constitute a felony." Section 14–1–3(5). Such admissions are not covered by the act, which for our purposes is limited to those persons who have "voluntarily admitted the commission of [a felony]." Section 12–25.1–2(6). Thus I disagree with the court's conclusion that the act applies to juveniles who admit to acts that would amount to felonies if they had been committed by an adult.

I also do not agree that the Legislature intended and contemplated that an act for which a juvenile is adjudged delinquent should be considered a crime in the context of a civil action brought by a victim of the crime. It is true that § 14–1–66 of the Family Court Act allows victims to petition the court for information about a juvenile accused of committing a crime solely for the purpose of allowing the victim to commence a civil action against the juvenile and/or his parents to recover for damages sustained as a result of the crime. *See In re Falstaff Brewing Corp. Re: Narragansett Brewery*

---

**5.** When defendant was adjudicated a delinquent, the law did not allow a juvenile under the age of sixteen to be waived by the Family Court or to be certified. *See* P.L.1990, ch. 18, § 2 (adding new sections 14–1–7, 14–1–7.1, 14–1–7.2, and 14–1–7.3 to provide for such waiver or certification).

*Fire,* 637 A.2d 1047, 1050 (R.I.1994) ("[t]he clear legislative intent behind § 14–1–66 is to allow victims to recover, via a civil action, damages suffered at the hands of a juvenile offender"). However, this statute falls within the exception to the general rule set forth in § 14–1–40(a) that no child shall be "deemed a criminal by reason of that [delinquency] adjudication, nor shall that adjudication be deemed a conviction, nor shall any child be charged with or convicted of a crime in any court, *except as provided in this chapter* [chapter 1 of title 14]." (Emphasis added.)

Unlike this law, the criminal royalties act was not enacted as part of chapter 1 of title 14 but as chapter 25.1 of title 12 of the General Laws. Had the Legislature truly intended and contemplated that the act would apply to juveniles, it would have enacted it as part of chapter 1 of title 14 and thereby squarely placed it within the purview of the exception to the general rule set out in § 14–1–40(a). Thus when the Legislature wanted to enable the victims of juvenile offenses to obtain the information they needed to commence civil actions against the responsible juveniles, it passed such a law (§ 14–1–66) as part of chapter 1 of title 14, thereby fitting such a provision within the exception to the general rule of § 14–1–40(a) that children are not to be deemed criminals or to have been convicted of any crime "except as provided in this chapter." However, it has not done so with respect to the criminal royalties act. Accordingly I do not agree that acts for which a juvenile has been adjudged delinquent retain their criminal character under the criminal royalties act, much less that they should be considered crimes in the context of the victims' civil actions. Such an interpretation eviscerates § 14–1–40(a)'s "except as provided in this chapter" clause and opens a gaping "civil action" hole in the Legislature's policy against treating children as criminals.

By drawing such careful and deliberate distinctions between juvenile adjudications for delinquency or waywardness and criminal felony convictions, the General Assembly has sounded a clear and certain trumpet. In these circumstances our duty is equally clear and certain:

"In the face of a statute so clear and unambiguous there is no room for the application of the usual canons of statutory construction. In such a case the statute declares itself. We may not where no ambiguity exists search beyond the statute for a different meaning. Even hardship does not justify a court in reading into a statute something contrary to its unequivocal language. Only when the legislature sounds an uncertain trumpet may the court move in to clarify the call. But when the call is clear and certain as it is here we may not consider whether the statute as written comports with our ideas of justice, expediency or sound public policy. In such circumstances that is not the court's business." *Kastal v. Hickory House, Inc.,* 95 R.I. 366, 369, 187 A.2d 262, 264–65 (1963) (citations omitted); *see also Parkway Towers Associates v. Godfrey,* 688 A.2d 1289, 1294 (R.I.1997).

In sum, I believe that the act is inapplicable to juvenile defendants and that any constitutional analysis of the act is unnecessary to the result and, therefore, merely advisory. *See Rhode Island Ophthalmological Society v. Cannon,* 113 R.I. 16, 28, 317 A.2d 124, 130–31 (1974) (although "there is no express language in the Rhode Island [C]onstitution which confines the exercise of our judicial power to actual 'cases and controversies[,]' * * * we will not render advisory opinions or function in the abstract"). Because " '[n]o question can be brought before a judicial tribunal of greater delicacy than those which involve the constitutionality of a legislative act,' " *Blais v. Franklin,* 30 R.I. 413, 421, 75 A. 399, 403 (1910), this court's teaching in *Newell v. Franklin,* 30 R.I. 258, 265–66, 74 A. 1009, 1012 (1910) (quoting Thomas M. Cooley, LL.D., *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 231 (7th ed. 1903)), bears repeating:

"Neither will a court, as a general rule, pass upon a constitutional question, and decide a statute to be invalid, unless a decision upon that very point becomes necessary to the determination of the cause. While courts cannot shun the discussion of constitutional questions when fairly pre-

sented, they will not go out of their way to find such topics. They will not seek to draw in such weighty matters collaterally, nor on trivial occasions. It is both more proper and more respectful to a coördinate department to discuss constitutional questions only when that is the very *lis mota.* Thus presented and determined, the decision carries a weight with it to which no extra-judicial disquisition is entitled.' In any case[,] therefore, where a constitutional question is raised, though it may be legitimately presented by the record, yet if the record also presents some other and clear ground upon which the court may rest its judgment, and thereby render the constitutional question immaterial to the case, that course will be adopted, and the question of constitutional power will be left for consideration until a case arises which cannot be disposed of without considering it, and when consequently a decision upon such question will be unavoidable."

For these reasons I concur in the result of the court's decision to dismiss the plaintiffs' claims under the act, but I disagree with the conclusion that the act applies to this defendant. Thus I would resolve this aspect of the case as a matter of legislative interpretation rather than reach and decide the constitutionality of the act.